Jeffrey Dweck, Esq.
THE LAW FIRM OF JEFFREY S. DWECK, P.C.
43 West 33rd Street, Suite 304
New York, New York 10001
(212) 967-0500
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **JTRE MANHATTAN AVENUE LLC and JTRE 807 MANHATTAN AVENUE LLC,** | |
| Plaintiff, | **Case No. 21-CV-05714 (JLR)** |
| -against- | |
| **CAPITAL ONE, N.A.,** | |
| Defendant. | |

**DECLARATION OF JACK TERZI IN SUPPORT OF PLANITIFF'S MOTION FOR SUMMARY JUDGMENT**

JACK TERZI, duly affirming under the penalties of perjury, states as follows:

1.     I am JACK TERZI, Authorized Representative and Officer of the Plaintiffs JTRE Manhattan Avenue LLC and JTRE 807 Manhattan Avenue LLC (together, "JTRE").

## NATURE OF THE ACTION

2.     This is an action for money damages arising from a lease between JTRE, as successor-in-interest to the landlord, and the Defendant Capital One, N.A. (the "Capital One"), as tenant and Capital One's clear breach of the subject lease when it vacated early and stopped paying rent, and its refusal to comply with the lease's unequivocal contractual obligations.

## THE PARTIES

3.     JTRE Manhattan Avenue LLC is a New York limited liability company with its principal place of business located at 362 Fifth Avenue, New York, New York.

4.     JTRE 807 Manhattan Avenue LLC is a New York limited liability company with its principal place of business located at 362 Fifth Avenue, New York, New York and is the successor in

interest to JTRE 241 Fifth LLC.

5.      I believe that Capital One, N.A. is a national banking association, with a principal place of business located at 275 Broadhollow Road, Melville, New York.  Pursuant to 28 U.S.C. § 1348, Capital One, N.A. is a resident of Virginia.

## JURISDICTION AND VENUE

6.      This court has diversity jurisdiction over this action pursuant 28 U.S.C. § 1332(a) and as set forth in Defendant's Notice of Removal, dated July 1, 2021.

7.      Venue is proper in this Court because the parties agreed in writing, before this action was commenced, that any actions arising out of the parties' lease shall be brought exclusively in a court of competent jurisdiction, state or federal, located in New York County.

## Background and the Lease Agreement

8.      The parties to this case are parties to a long-term lease agreement (the "Lease") between Plaintiffs, as Landlord, and Defendant, as Tenant.  The Premises had previously been owned by Capital One bank (since around 2006) who sold it to Plaintiff's predecessor-in-interest, taking a lease back for the subject premises.

9.      The subject Lease was for a term of twenty years, which was set to expire on October 31, 2035.[1]   A true an accurate copy of the Lease is provided herewith as Plaintiff's Exhibit 1.

10.     Under the Lease terms, Capital One rented the ground floor commercial condominium unit (the "Premises") located at 807 Manhattan Avenue, Brooklyn, New York (the "Building"), for a term expiring on October 31, 2035.

11.     The property is comprised of two buildings, the "Manhattan Avenue Building" and the "Calyer Building."

---

[1] Capital One had an early termination option to terminate the Lease (for any reason) effective as of October 31, 2021.

**The Condominium**

12.     JTRE is the current landlord under the Lease, having purchased the Building from an entity called 807 Manhattan Avenue Holding LLC and assumed the obligations of landlord under the Lease on May 29, 2018 pursuant to an instrument entitled Assignment and Assumption of Lease executed by JTRE and its predecessor 807 Holdings.

13.     Upon information and belief, prior to that Capital One had sold the Property to 807 Manhattan Avenue Holding LLC.

14.     On June 23, 2017, 807 Holdings and 807 Manhattan Avenue LLC ("Slate") entered into a "Declaration Establishing a Plan for Condominium Ownership of the Premises known as 807 Manhattan Avenue, Brooklyn, New York 11222" (the "Condo Declaration").  A true and accurate copy of the Condo Declaration is attached here as <u>Exhibit 2</u>.

15.     The building at issue, 807 Manhattan Avenue, Brooklyn, New York was in the process of undergoing a condominium conversion whereby the building was to be split into two (2) condominium units – a multi-unit residential component and a commercial component.  The project was to be named "807 Manhattan Avenue Condominium."

16.     Slate was to be the owner of the residential portion ("Commercial Unit 2" or "C2").

17.     As part of the conversion, Slate, as the residential owner, agreed to provide the commercial unit – the premises at issue – a new heating, ventilation and air conditioning ("HVAC") system.  See Exhibit 2 (Condo Declaration) Article 2.5 and Schedule 2.5 annexed thereto.  They further agreed to do so at their sole expense and with no adverse effect on Plaintiff or its tenant. See Article 35.

18.     The Lease actually contemplated the Condominium conversion and provided, for example, that "Tenant acknowledges that Landlord intends to convert the Property to a Condominium form of ownership …. Tenant acknowledges that to complete the Condominium conversion, the Building may undergo construction, alterations, additions or improvements which may consist of demolition or cause excessive nose, vibrations, dust, debris and the eviction of scaffolding or other protective measures …."

See Section 34.1 of the Lease annexed hereto as <u>Exhibit 1</u>.

**JTRE Takes Over as Landlord**

19.     Thus, upon purchasing Premises, JTRE stepped into the shoes of its predecessor with respect to the Lease, the Commercial Unit ("C1") Owner.  At the time of JTRE's purchase, Capital One was the only tenant in the Building.

20.     The subject Lease was for a term of twenty years, which was set to expire on October 31, 2035.  Capital One did have an early termination option to terminate the Lease (for any reason) effective as of October 31, 2021.

21.     JTRE first became interested in purchasing the Building in 2018. To that end, JTRE asked the prior owner to obtain an estoppel certificate from Capital One to determine whether Capital One knew of any defaults under the lease or had any material complaints about the Building. Capital One issued an Estoppel Certificate to JTRE on May 7, 2018 (the "Estoppel Certificate").

22.     Capital One executed the Tenant Estoppel Certificate, by which it certified to JTRE 807 that: "Neither [Capital One], nor to [Capital One's] knowledge, [Slate], is in default under any of the terms and conditions of the Lease."  A true and accurate copy of the Tenant Estoppel Certificate is attached here as <u>Exhibit 4</u>.  The Estoppel Certificate also affirmed that Capital One understood that JTRE was "relying upon the representation" made.[2]

23.     Indeed, one of the paramount purposes behind JTRE obtaining the representations from Capital One in conjunction with its transaction with JTRE was to estop Capital One from later raising claims against JTRE, as successor to JTRE, which Capital One knew or should have known at the time Capital One executed the estoppel certificate.

24.     One of the points of having Capital One directly certify to JTRE that 807 Holdings was not in default under any of the term and conditions of the Lease was to afford to JTRE protection if a situation

arose such as the one currently before the Court -- Capital One asserting that it is excused from fulfilling its obligations under the Lease because of alleged landlord defaults that existed prior to the closing of JTRE's transaction with JTRE.

25.     On May 29, 2018, as part of its sale to JTRE, 807 Holdings sent a Tenant Notice Letter to the following:

     a.  Capital One, N.A.
        275 Broadhollow Road
        Melville, New York 11747
        Attn: Real Estate Administration

     b.  Capital One, N.A.
        680 Capital One Drive, 12th Floor
        McLean, Virginia 22102
        Attn: Chief Counsel – Transactions

     c.  Katsky Korins LLP
        605 Third Avenue
        New York, New York 10158
        Attn: Neil S. Miller, Esq.

26.     Slate's Tenant Notice Letter provided as follows: "[Y]ou are hereby authorized and directed to make all future payments under the lease to [JTRE] and to address any and all notices and other communications to the landlord under or in connection with your lease to [JTRE] or [JTRE's] property manager at such address as may be designated by [JTRE]."  A true and accurate copy of the Tenant Notice Letter is attached here as <u>Exhibit 5</u>.

**<u>Capital One's Claims</u>**

27.     Surprisingly, only a few months later (less than five months after closing), and despite the Estoppel Certificate, Capital One began sending JTRE letters asserting that certain conditions existed in the Premises that violated the Lease, which JTRE promptly addressed.  Specifically, on October 19, 2018, Capital One sent JTRE a notice of default claiming several breaches of the Lease relating to inadequate heating in the Building. A copy of that notice is provided herewith as <u>Exhibit 6</u>.

---

[2] Prior to that, on April 13, 2018, Capital One had sent a notice to its landlord Slate alleging Landlord

28.     The notice of default claimed that Capital One had incurred supplemental heating costs during the winter of 2017-2018 due to the Building's inadequate heat and demanded that JTRE reimburse it for those costs, in excess of $200,000.00. Notably, the alleged heating failures about which Capital One initially complained had occurred while the prior owner owned the Building.

29.     To be clear, the condition causing the alleged lack of adequate heat to the Premises arose prior and was known to Capital One when it issued the estoppel certificate.

30.     The fact that Capital One had incurred over $200,000.00 in heat-related costs the winter before JTRE purchased the Building also was known to Capital One when it issued the estoppel certificate.

31.     In the October 19, 2018 letter, Capital One decided despite this that the alleged insufficient or heat and JTRE'S failure to reimburse Capital One's heating costs were defaults by the landlord under the Lease.

32.     Capital One sent a follow up letter on November 7, 2018, a copy of which is provided herewith as Exhibit 7.

33.     The Lease document makes it abundantly clear, per Sections 10.1 and 12.2, that the landlord bears no responsibility for the functioning, repair, or maintenance of the heating system. As such, Capital One's prior claims against JTRE and, to the extent such a claim may be asserted against Plaintiff as successor-in-interest to JTRE, are without merit.

34.     Specifically:

    i.  According to Section 10.2 of the Lease, the Landlord is responsible to maintain, foundations, exterior surfaces, paint, plumbing system to the connecting point of the meters, the electrical system to the connecting point of the meters, all structural systems, roof membrane (including interior ceiling, inventory and other personal property if damaged by leakage emanating from the portion of the MA Building outside of the Premises or from the Calyer Building leaking into the ATM space, etc.).

    ii. Under Section 10.1 (Maintenance and Repairs by Tenant) the Tenant is charged with maintaining the heating, ventilating and air-conditioning system including the maintenance and replacement of the boiler unit, which expressly serve the premise, HVAC, whether located within or outside of the Premises, pursuant to a maintenance

defaults under the Lease.  A copy of the notice is provided herewith as Exhibit 3.

       contract.

    iii.    Section 10.4 reiterates that the Landlord "shall not be liable for any failure on the part of the owner and Condo Board."

    iv.    Under Section 12.2 (Landlord's Obligations), the Lease makes clear that while the Landlord does have obligations to repair structural problems, "however, Landlord shall not be responsible for any fault of Owner or the Condo Board."

    v.    Section 12.3 of the Lease precludes any suit for damages against the Landlord where utilities or services are interrupted or terminated because of repairs, installations, improvements or any cause beyond Landlord's reasonable control. The Lease makes clear that any such interruption or termination <u>does not</u> relieve the Tenant from performance of any of its obligations thereunder, including the obligation to pay rent.

    vi.    Section 34.1 further provides that "Tenant acknowledges that Landlord intends to convert the Property to a Condominium form of ownership …. Tenant acknowledges that to complete the Condominium conversion, the Building may undergo construction, alterations, additions or improvements which may consist of demolition or cause excessive nose, vibrations, dust, debris and the eviction of scaffolding or other protective measures …." … "Landlord agrees to use commercially reasonable efforts to minimize interference with the conduct of Tenant's business. …"

See <u>Exhibit 1</u>.

35.    A series of e-mails sent between mid-December 2017 and early January 2018 among Capital One and 807 Holdings (the prior owner of Unit C1) make clear that Capital One knew about and had been dealing with heating issues before JTRE ever entered the scene. See <u>Exhibit 8</u> provided herewith.

36.    October 2018 emails evidence that Capital One had always corresponded with Slate with respect to these issues and Slate, in turn, had been dealing with them. See Email chain provided herewith as <u>Exhibit 9</u>.

37.    Notwithstanding, JTRE worked closely with the Capital One to help investigate rectify their heating issues.

38.    We met on November 8, 2018 with Danielle Guadio, the head of real estate for Capital One and their facilities team to go through the issues raised in their letter and other maintenance concerns. See email provided herewith as <u>Exhibit 10</u>.

39.    Emails, for example, from November 16, 2018 (a true and accurate copy of which is provided herewith as <u>Exhibit 11</u>) evidence that the parties had met in person and expressed a commitment

to a productive relationship ("A pleasure to finally meet you in person last week. I'm glad we had the opportunity to understand everything that's been going on. We want you to know that there is an open door policy for us, and any time you have a question or something arises please call Morris or myself.  I look forward to our continued relationship, and success of Capital One at 807 Manhattan Avenue.")

40.     On November 19, 2018, we had a letter sent to Slate detailing the issues that were raised to us.  A copy of that letter is provided herewith as Exhibit 12.

41.     On November 20, 2018, JTRE's first law firm, LaRocca Hornik Rosen Greenberg & Blaha LLP ("LaRocca Hornik"), responded to Capital One's October 19, 2018 and November 7, 2018 notices of default.  JTRE stated that the insufficient heating was Capital One's responsibility under Section 10.1 of the Lease.  A true and accurate copy of the correspondence is attached here as Exhibit 13.

42.     In that letter we explained that the insufficient heating was Capital One's responsibility under Section 10.1 of the Lease.  Either that, or they were Slate's responsibility as the Condominium sponsor. Id.

43.     When Slate had been approached by us they had acknowledged that they were responsible to make the necessary installations and repairs to the HVAC system.  Defendant, too, acknowledged that Slate was the responsible party.

44.     In fact, Capital One had been in contact with our predecessor-in-interest and Slate in an ongoing dialogue about the construction of the condominium and how the construction of the residential units was affecting the commercial space.

45.     See, for example, an email chain From December 2018 through January 2019 provided herewith as Exhibit 14 (and another as Exhibit 15) which is one of hundreds of emails exchanged between Slate and Capital One, often with JTRE included, regarding the construction and/or repair of the space. Slate and Capital One had been corresponding in an effort to get the radiators in the bank installed and in working order.

46.     Nonetheless, JTRE acted consistently to intervene on Capital One's behalf with Slate.  See,

for example:

> **From:** Morris Terzi [mailto:mt@jtreholdings.com]
> **Sent:** Friday, February 15, 2019 12:16 PM
> **To:** pwoody@slatepg.com; Jeff Yachmetz <jyachmetz@slatepg.com>; DavidSchwartz <david@slatepg.com>; gavramides@slatepg.com
> **Cc:** Jack Terzi <jack@jtreholdings.com>
> **Subject:** 807 Manhattan Avenue - Water Urgent
>
> All,
>
> We just received word from Capital One that Slate turned off all water service to the Bank yesterday with no prior notice, and that the water is still not on.  The Bank now has been without water and functioning bathrooms since yesterday afternoon with no information about when the water service will be turned back on.  Apparently now there also is an odor in the bank's break room.  How is this possible?   What happened and why?  With this lack of planning and, frankly, reckless activity Slate continues to put both Capital One and JTRE in an untenable position.  Request an **immediate** response with the steps Slate is taking to turn water service back on and provide information about why it was turned off in the first place.
>
> Morris

47.     Throughout 2019 JTRE had intervened to try and help resolve Capital One's issues and Slate had been responding and following up.  Slate, not Plaintiff, was clearly the party responsible for the repairs Capital One was looking for.  Just by way of example:

> a.   A January 2019 email demonstrates that Capital One had only been looking to Slate to reimburse them for the damages sought herein.  See Exhibit 16.
>
> b.   Another January 2019 email exchange demonstrates Slate's hands-on activity and direct correspondence with Capital One with respect to Capital One's issues. See Exhibit 17.

48.     On July 19, 2019 counsel for Capital One, McCarter & English, sent a letter to JTRE's former counsel saying "in the April 13, 2018 Notice, the bank notified the original Landlord that the work done during the condominium conversion interfered with the Banks business and disturbed the Banks quiet enjoyment of the Lease Space."  In that same notice (Page 3), counsel for the bank writes "these results were conclusive proof that the system installed by 807 MA [Slate] is at best inadequate and at worst

faulty." See Exhibit 18.[3]

49.     Provided herewith as Exhibit 19 from JTRE's business records are notes recapping a meeting we had to try and help resolve Capital One's issues.

50.     We continued trying to help the parties resolve their issues.  An internal email August 16, 2019 demonstrates, for example, efforts being made to remediate conditions at the Premises.  See Exhibit 20.

51.     Emails from September 13 and 18, 2019, for example, also demonstrate efforts being made to remediate conditions at the Premises.  See Exhibits 21 and 22.

52.     On October 31, 2019, JTRE emailed Slate to visit the site immediately because of reported leaks ("Jeff / Georgios - Capital One has sent the below photos stating a leak in the space behind the ATM Machines. This is directly below the construction site, can you have someone onsite check this out immediately?") See Exhibit 23.

53.     Emails from December 3-4, 2019 demonstrate the efforts we took to have Slate intervene with respect to alleged leaks.  See Exhibit 24.

54.     On December 12, 2019, Capital One's attorneys again reached out to our attorneys, again looking to JTRE to remedy an issue which was not Landlord's responsibility under the Lease.  They said that "On October 8, 2019, you confirmed that JTRE would provide supplemental heat to the bank's space this winter.  Capital One is now reporting that the temperature in the ATM room has dropped to 57 degrees, which is unacceptable. . . . If JTRE does not provide supplemental heat by tomorrow morning, Capital One will be forced to engage in self-help and reserves the right to abate rent for this and all prior defaults and/or to seek reimbursements for costs incurred.  In addition, please advise as to the status of JTRE's investigation and repair of the leaks that have occurred this week and last week."  See Exhibit 25.

---

[3] Essentially, as set further forth below, Capital One claimed that the Condominium, not the Landlord, was responsible for the subject issues being complained of.  In Capital One's January 8, 2020 notice (Exhibit 29, Page 2), they again acknowledged: "moreover it is obvious that all of these problems and disruptions stem from faulty work related to Slates construction of the property."

55.     On December 14, 2019, counsel for Capital One again reached out to our attorneys and again mischaracterized our Lease obligations: "[T]he branch is reporting leaks and construction debris today. . . . <u>Id.</u>

56.     On December 26, 2019, LaRocca Hornik responded to McCarter & English by stating: "[JTRE] is not obligated under the Lease or otherwise to provide heat to [Unit C1]," and "[JTRE] has no duty to [Capital One] to provide heat in the first instance . . . ."   A true and accurate copy of the correspondence is attached here as <u>Exhibit 26</u>.

57.     In or around January 2020, Capital One emailed counsel for JTRE asking JTRE to join them in sending a Joint Letter that they would draft to Slate about conditions at the property.  The email dated January 3, 2020 and draft letter attached to it are annexed hereto as <u>Exhibit 27</u> and are true and accurate copies.

58.     On January 2, 2020, JTRE again intervened to try and get Capital One's alleged leak issue investigated.   See <u>Exhibit 28</u> provided herewith.

59.     On January 8, 2020, McCarter & English sent LaRocca Hornik a letter alleging that JTRE failed to cure any of the issues raised in Capital One's prior notices of default.  Capital One also notified JTRE of additional issues, including the presence of mold and a summons from the FDNY for citations relating to the refrigeration and air-conditioning systems.  A true and accurate copy of the notice is attached here as <u>Exhibit 29</u>.

60.     On or around January 9, 2020 we changed attorneys and retained Rivkin Radler LLP ("Rivkin Radler").

61.     On January 15, 2020, Rivkin Radler sent McCarter & English a response to Capital One's January 8, 2020 notice.  In that correspondence, Rivkin Radler stated: "Our office is counsel for JTRE with respect to the [Lease] and, as such, all future correspondence relating to this matter should be directed to our office."  Additionally, JTRE claimed that it had "no obligation under the Lease or otherwise to provide supplemental heat to any portion of [Unit C1]."  A true and accurate copy of the correspondence is attached

here as Exhibit 30.

62.     On February 25, 2020, Capital One's attorney wrote a letter to JTRE's prior counsel asserting that Capital One was terminating the Lease effective as of June 30, 2020, because JTRE allegedly failed to cure "lease defaults" which pre-dated JTRE's ownership, notwithstanding the Estoppel Certificate. See Exhibit 31.

63.     The attorney's February 2020 letter also asserted – as an alternative in case their allegations of default failed – that Capital One was exercising their early termination option to terminate the lease effective as of October 31, 2021.  We respectfully submit that such a letter cannot be sent in the alternative inasmuch as the two positions are mutually exclusive if not contradictory.

64.     However, for the reasons discussed in further detail below, counsel's February 25, 2020 letter failed, as a matter of law, to terminate the Lease.  The letter was defective inasmuch as there was no lease default. Further, the letter was not served in accordance with the Lease "Notices" provision.  There is no dispute on that issue (Defendant's claim is that inasmuch as JTRE received actual notice, the letter complied).

**Capital One's Breaches**

65.     On or about March 20, 2020, Capital One ceased operating at the Premises and vacated the Premises.

66.     Capital One ceased tendering rent payments after June 30, 2020, having made the decision at that time to repudiate the Lease in its entirety.

67.     Since the Lease was still in full force and effect and Capital One had breached its terms, in January of 2020, JTRE asserted its rights and remedies against Capital One by terminating the Lease, based on Capital One's rent default.  Capital One's breach of the Lease has caused JTRE to incur damages and, consequently, to default under its mortgage for the Premises.

68.     On or about July 1, 2020, Capital One materially breached the terms and conditions of the Lease by failing to pay Rent to JTRE in the total amount of $96,079.67.  Specifically, Capital One failed to

pay to JTRE: (a) Minimum Monthly Rent in the amount of $48,333.33, violating Section 5.1 of the Lease; and (b) Additional Rent in the amount of $47,746.34, violating Sections 5.2, 6.1, and 11.2 of the Lease.

69.     On August 1, 2020, Capital One further materially breached the Lease by failing to pay to JTRE Rents in the amount of $50,255.19.  Specifically, Capital One failed to pay to JTRE: (a) Minimum Monthly Rent in the amount of $48,333.33, violating Section 5.1 of the Lease; and (b) Additional Rent in the amount of $1,921.86, violating Sections 5.2 and 11.2 of the Lease.

70.     On September 1, 2020, Capital One again materially breached the Lease by failing to pay to JTRE Rents in the amount of $50,255.19.  Specifically, Capital One failed to pay to JTRE: (a) Minimum Monthly Rent in the amount of $48,333.33, violating Section 5.1 of the Lease; and (b) Additional Rent in the amount of $1,921.86, violating Sections 5.2 and 11.2 of the Lease.

71.     On September 21, 2020, JTRE's counsel delivered to Capital One's counsel a written notice demanding that Capital One resume the performance of its obligations under the Lease and pay the then outstanding Rent for the period of July 1, 2020 through September 30, 2020 in the total amount of $190,824.47.  See Exhibit 32.

72.     Capital One failed to respond to the written notice.

73.     On October 1, 2020, Capital One materially breached the Lease by failing to pay to JTRE Rents in the amount of $50,255.19.  Specifically, Capital One failed to pay to JTRE: (a) Minimum Monthly Rent in the amount of $48,333.33, violating Section 5.1 of the Lease; and (b) Additional Rent in the amount of $1,921.86, violating of Sections 5.2 and 11.2 of the Lease.

74.     On November 1, 2020, Capital One further materially breached the Lease by failing to pay to JTRE Rents in the amount of $55,088.53.  Specifically, Capital One failed to pay to JTRE: (a) Minimum Monthly Rent in the amount of $53,166.67, violating Section 5.1 of the Lease; and (b) Additional Rent in the amount of $1,921.86, violating Sections 5.2 and 11.2 of the Lease.

75.     On December 1, 2020, Capital One materially breached the Lease again by failing to pay to JTRE Rents in the amount of $102,278.93.  Specifically, Capital One failed to pay to JTRE: (a) Minimum

Monthly Rent in the amount of $53,166.67, violating Section 5.1 of the Lease; and (b) Additional Rent in the amount of $49,112.26, violating Sections 5.2, 6.1, and 11.2 of the Lease.

76.    On December 22, 2020, JTRE delivered a written notice (the "Notice to Cure") to Capital One demanding payment of the then outstanding Rent for the period July 1, 2020 through December 31, 2020 in the total amount of $404,212.70.  JTRE demanded payment of the Default Arrears by January 8, 2021 (the "Cure Date").  The Notice to Cure advised Capital One that if Capital One failed to cure its default by paying JTRE the full amount of the outstanding Rent on or before the Cure Date, then

> JTRE "will elect to terminate the Lease on three (3) days' notice and the Lease and term thereof shall terminate and expire as fully and completely as if that day were the expiration date of the Lease."

See Exhibit 33.

77.    When Capital One failed to pay by the Cure Date -- a Tenant Default under Section 20.1 of the Lease, on January 11, 2021 JTRE terminated the Lease effective as of January 15, 2021 (the "January Termination Date"). Through the January Termination Date, Capital One undisputedly failed to pay JTRE $459,301.23 (the "Rent Arrears").  See Exhibit 34.

78.    Capital One did not respond to the Notice of Termination.

79.    Moreover, after Capital One vacated the Premises, it failed to comply with its Lease obligations to restore the Premises to its original condition. To this end, Article 14 of the Lease provides, in pertinent part, that at the expiration of the Lease or earlier termination thereof, Capital One was required to "remove its trade fixtures, security deposit box assemblies, ATMs, signs, and all other personal and/or proprietary property (collectively, "Tenant's Trade Fixtures")," and "repair any damage to the Premises or the Building caused by Tenant's removal of the same."

80.    Specifically, Capital One left behind two (2) bank vaults and all of their fixtures – safety deposit boxes, desks, and the like.

**Termination and Damages Under The Lease**

81.    The Lease is for a term of 20 years and permits Capital One to use the Premises for

14

"Financial Services," as defined in Section 7.1 of the Lease, and all uses associated with such business and any other lawful use.

82.     Pursuant to the terms of the Lease, in consideration for Capital One's possession and use of the Premises, Capital One covenanted and agreed to pay certain minimum and additional rent to JTRE on the first day of each month in the amounts specified in the Lease.

83.     Specifically, Section 5.1 of the Lease provides that Capital One shall pay to JTRE minimum annual rent (the "Minimum Annual Rent") in monthly installments (the "Minimum Monthly Rent") no later than the first day of each calendar month of the Lease (hereinafter Minimum Annual Rent and Minimum Monthly Rent are collectively referred to as "Minimum Rent").

84.     Additionally, Section 5.2 of the Lease provides that Capital One shall pay to JTRE all other sums of money due and payable under the Lease (the "Additional Rent"), including the Bank's pro-rata share of real estate taxes and insurance and maintenance costs as set forth therein (hereinafter Minimum Rent and Additional Rent are collectively referred to as "Rent").

85.     Under the express terms of Section 7.2 of the Lease, Capital One may cease operating at the Premises provided it continues to pay to JTRE Minimum Rent and Additional Rent and continues to abide by the other terms of the Lease.

86.     The parties agreed that JTRE, as landlord, has certain termination rights in the event Capital One defaults under the Lease, including the non-payment of rent.

87.     Pursuant to Section 20.1 of the Lease, a "Tenant Default" occurs in the event Capital One fails to make any payment of Rent as and when due, and such failure continues for more than ten days after Capital One's receipt of written notice of non-payment from JTRE.

88.     Section 20.2 of the Lease provides that if a Tenant Default occurs, then after the expiration of the applicable notice and cure period, JTRE is entitled to terminate the Lease and elect collect liquidated damages in a lump sum from Capital One.

89.     Specifically, Section 20.2 provides in pertinent part:

> On the occurrence of a Tenant Default and after the applicable notice and cure period …, Landlord may:… (b) terminate this Lease, whereupon … Landlord may collect liquidated damages from Tenant in an amount equal to (i) the sum of all amounts due hereunder to the date of termination, plus (ii) the aggregate Rent remaining over the unexpired portion of the Lease Term, plus the reasonable cost to Landlord for any repairs and other costs of re-letting…, all reduced to present value… , less (iii) the aggregate fair net rental value of the Premises over the remaining portion of the Lease Term (provided however a reasonable period of time, not to exceed eighteen (18) months, may be considered as a leasing period by which the Premises would not be leased and therefor no income would be realized for such period) reduced to present value, plus (iv) Landlord's costs and expenses incurred in the enforcement hereof including reasonable attorneys' fees as herein provided or (c) recover all Rents as they become due under the Lease, less any rents or other fees collected by Landlord in connection with any re-letting or licensing of the Premises (which credit will be reduced by the reasonable cost to Landlord for any repairs to the Premises and other costs of re-letting (such as broker's commissions and the cost of advertising)).

90.     Further, Section 18.1(b) of the Lease provides in pertinent part that Capital One shall indemnify, pay, reimburse, and hold JTRE harmless from and against any and all losses, damages, liabilities, costs, fees or expenses (including reasonable attorneys' fees, court costs, and expert witness fees) actually incurred by JTRE arising from any breach, violation, or non-performance of the Lease by Capital One.

91.     Thus, JTRE brought this action to recover (a) past due rent, (b) restoration costs, and (c) liquidated damages for the unexpired portion of the Lease term.  Capital One cannot dispute that it has not paid rent after June 30, 2020, or that it failed to restore the Premises to the condition required by the Lease upon its vacatur.

92.     JTRE seeks to collect the fixed rents and additional rents that accrued under the lease from July 1, 2020 through December 31, 2020 in the amount of $404,212.70.

93.     Moreover, pursuant to Section 20.1 of the Lease, JTRE is entitled to collect from Capital One liquidated damages in a lump sum as provided for therein.

94.     Section 20.2 of the Lease provides that, if JTRE terminates that Lease, JTRE is entitled to recover "the aggregate Rent remaining over the unexpired portion of the Lease Term…" JTRE estimates

that the Accelerated Damages for the remainder of the lease term (January 1, 2021 - October 31, 2035) totals $12,069,735.19, with a present value of $8,967,991.03 [using a 2% rate and a 15-year term] less $4,618,556.25 in market rent, reduced to a present value of $3,431,655, for a total liquidated damage of $5,536,335.71,

95.     The Lease (Section 20.2) expressly provides that JTRE's liquidated damages may include the amount of repairs to the Premises and brokers' commissions that JTRE pays in connection with re-letting the Premises.  Any such repairs and commissions will cost JTRE not less than $814,000 in estimated repairs and $250,000 in estimate commissions for a total of $1,064,000.

96.     The Building contains a vault which has little or no utility to any tenant other than a bank.

97.     At present, despite commercially reasonable efforts, JTRE has been unable to find a bank willing to lease the Premises or any other tenant. See, for example, marketing material that we had circulated, Exhibit 35.

98.     Because the Premises cannot readily be leased to non-bank tenants with the vault, the removal of the vault constitutes a re-letting cost, which, under the terms of the Lease, Capital One is obligated to pay.

99.     The removal of the vault will cost an estimated $814,662.00.  Provided herewith as Exhibit

100.     36 is an estimate provided by our contractor.

101.     JTRE is entitled to recover, in total, $7,005,209.71.  This amount also does not include leasing commissions and legal fees that JTRE is entitled to recover under the Lease.

102.     JTRE has also incurred, and will continue to incur, attorneys' fees, expert witness fees, and costs as a result of Capital One's default of its payment obligations pursuant to the express terms of the Lease, in an amount believed to be no less than $250,000.00.

103.     The Lease also provides for Interest at the rate 4% over Prime or 12% if lower (Section 33.1).

**Capital One Had No Right to Terminate and Did Not, In Fact Properly Terminate the Lease**

104.    Though a defect in the heating system may have existed, the Lease documents make it clear that this is not a default under the Lease as JTRE has no legal responsibility for repairing or maintaining the heating system.

105.    For one thing, the Estoppel Letter was essentially an admission or waiver on the part of Capital One that no issues existed as of the JTRE's acquisition of the Property.

106.    The Lease, too, excludes these repair issues from the Landlord's responsibilities.

107.    According to Section 10.2 of the Lease (which is subject to 10.4 of the Lease, discussed below), the Landlord is only responsible to maintain foundations, exterior surfaces, paint, plumbing system to the connecting point of the meters, the electrical system to the connecting point of the meters, all structural systems, roof membrane.

108.    Under Section 10.1 (Maintenance and Repairs by Tenant) the Tenant is charged with maintaining the heating, ventilating and air-conditioning system including the maintenance and replacement of the boiler unit, which expressly serve the premise, HVAC, whether located within or outside of the Premises, pursuant to a maintenance contract.

109.    The only exception to this is that the Tenant is not required to replace any building system during the final three (3) years of the Lease Term.  Thus, Capital One's October 19, 2018 demand for $207,000 for supplemental heating was completely without merit.

110.    Section 10.4 reiterates that the Landlord "shall not be liable for any failure on the part of the owner and Condo Board."

111.    Under Section 12.2(a) (Landlord's Obligations), the Lease makes clear that while the Landlord does have obligations to repair structural problems, "however, Landlord shall not be responsible for any fault of the [C2 condominium] owner or the Condo Board."

112.    Thus, it is hardly disputable that Capital One's acknowledged that Slate, not Plaintiff, were responsible for any issues relating to the HVAC or Slate's construction (including the roof they were working on).

18

113.    Even if somehow Capital One were to remove the conditions complained of from the scope of these Lease provisions, Section 12.3 of the Lease precludes any suit for damages against the Landlord where utilities or services are interrupted or terminated because of repairs, installations, improvements or any cause beyond Landlord's reasonable control. The Lease makes clear that any such interruption or termination <u>does not</u> relieve the Tenant from performance of any of its obligations thereunder, including the obligation to pay rent.

114.    Section 34.1 further provides that "Tenant acknowledges that Landlord intends to convert the Property to a Condominium form of ownership …. Tenant acknowledges that to complete the Condominium conversion, the Building may undergo construction, alterations, additions or improvements which may consist of demolition or cause excessive nose, vibrations, dust, debris and the eviction of scaffolding or other protective measures …." … "Landlord agrees to use commercially reasonable efforts to minimize interference with the conduct of Tenant's business. …"

115.    As stated above, on July 19, 2019 counsel for Capital One, McCarter & English, sent a letter to JTRE's former counsel saying "in the April 13, 2018 Notice, the bank notified the original Landlord that the work done during the condominium conversion interfered with the Banks business and disturbed the Banks quiet enjoyment of the Lease Space."  In that same notice (<u>Exhibit 18</u>, Page 3), counsel for the bank writes "these results were conclusive proof that the system installed by 807 MA [Slate] is at best inadequate and at worst faulty."

116.    Essentially, Capital One claimed that the Condominium, not the Landlord, was responsible for the subject issues being complained of.  In Capital One's January 8, 2020 notice (<u>Exhibit 29</u>, Page 2), they again acknowledged: "moreover it is obvious that all of these problems and disruptions stem from faulty work related to Slates construction of the property."

117.    As such, at no point was Capital One's required performance excused under the terms of the Lease.

118.    Central to this action and despite its acknowledgements, above, Capital One's law firm

McCarter & English, LLP ("McCarter") alleged by letter dated February 25, 2020 (Exhibit 31) to Rivkin Radler, JTRE's counsel, that Capital one was terminating the Lease effective as June 30, 2020.

119.    For the reasons discussed below, it is JTRE's position that Capital One did not terminate the Lease on either June 30, 2020 or October 31, 2021, as a matter of law.

### The 'Written Notice' Provisions in the Lease

120.    Before addressing the content of the February Letter, it is necessary to address how and where it was sent.  Article 31 of the Lease, entitled "Notices," provides the precise manner in which written notice under the Lease is to be served. It provides, in pertinent part that:

> **31.1 Written Notice; Delivery Methods.** Each party giving or making any notice, request, demand, consent, approval, or other communication (each, a "Notice" (but sometimes "notice") pursuant to this Lease shall: (i) give the Notice in writing; (ii) cause the Notice to be signed by an authorized representative of the sending party (the sending party's attorney is authorized to sign and send a Notice on behalf of the sending party); and (iii) use one of the following methods of delivery, each of which for purposes of this Lease is a writing: (a) personal delivery; (b) Registered or Certified Mail, in each case, return receipt requested and postage prepaid; or (c) nationally recognized overnight courier, with all fees prepaid.

> **31.2 Addresses.** Each party giving a Notice shall address the Notice to the appropriate person at the receiving party (the "Addressee") at the addresses listed in the Notice Addresses section of the Key Provisions Summary or to another Addressee or at another address as designated by a party in a Notice pursuant to this Section 31.

> **31.3 Effectiveness of a Notice.** Except as provided elsewhere in this Lease, **a Notice is effective only if (A) the party giving the Notice has complied with Sections 31.1 and 31.2 above** and (B) the Notice is deemed to have been received by the Addressee as provided below. A Notice is deemed to have been received by the Addressee as follows: (i) if a Notice is delivered in person, the date the personal delivery is made; (ii) if a Notice is delivered by a nationally recognized overnight courier, the next business day; (iii) if sent by Registered or Certified Mail, upon receipt by the Addressee *as* indicated by the date on the signed receipt; and (iv) if the Addressee rejects or otherwise refuses to accept the Notice, or if the Notice cannot be delivered because of a change in address for which no Notice was given, then upon the rejection, refusal, or inability to deliver the Notice (emphasis added).

See Exhibit 1.

121.    After JTRE assumed the Lease from Prior Landlord, Capital One was served with a "Tenant Notice Letter," dated May 29, 2018 (the "Notice Letter"), which specifically advised Capital One, among other things, "to address any and all _notices_ … to the landlord under or in connection with your lease to" JTRE at: c/o JTRE Holdings, LLC, 362 Fifth Avenue, 12th Floor, New York, New York 10001 (the "JTRE Notice Address").

**The Lease Did Not Terminate Effective as of June 30, 2020**

122.    Pursuant to the February 25, 2020 Letter, Capital One alleges that it terminated the Lease effective as of June 30, 2020, based on Section 21.1 of the Lease—titled "Failure to Perform." Section 21.1 states, in pertinent part, that if

> "Landlord fails to perform or observe any of its obligations u
>
> nder this Lease after … thirty (30) days after Landlord's receipt of written notice from Tenant (a "Landlord Default") … Tenant shall have the right to either terminate this Lease upon written notice to Landlord after the expiration of any applicable cure period, or abate any and all Rent payments owed to Landlord"

123.    Capital One alleges that, as a predicate to terminating the Lease under Section 21.1, it sent JTRE (and Prior Owner) multiple default notices between April 13, 2018, and January 8, 2020 ("Improper Default Notices"). However, the Improper Default Notices failed to comply with, *inter alia*, Articles 21 and 31 of the Lease and governing law and, therefore, were without force and effect to serve as predicate notices to terminate the Lease for several reasons. Among other things, the Improper Default Notices:

- failed to comply with the Notice Letter and Article 31 of the Lease in that they were not properly served upon JTRE at the JTRE Notice Address;

- failed to specify a date in which JTRE was required to cure the defaults alleged therein (*see 542 Holding Corp. v. Prince Fashions, Inc.*, 46 AD3d 309, 311 [2007] ["The purpose of a notice to cure is to specifically apprise the [party] of claimed defaults in its obligations under the lease and of the forfeiture and *termination of the lease if the claimed default is not cured within a set period of time*"] [emphasis supplied]; see also *Favourite v. 55 Halley St., Inc.*, 381 F. Supp. 3d 266, Fn. 5 [S.D.N.Y. 2019] ["The purpose of a Notice to Cure is to specifically apprise the tenant of claimed defaults in its obligations under the

lease and of the forfeiture and termination of the lease if the claimed default is not cured within a set period of time"]).

- did not advise JTRE that such notice was, in fact, a default notice under Article 21 of the Lease (*see id.*)

- Did not advised JTRE that if it failed to cure the alleged defaults by a date certain, Capital One reserved its right to terminate the Lease (*see 49 W. 12 Tenants Corp. v. Seidenberg*, 6 AD3d 243, 244 [1st Dept 2004] [predicate notice ineffective where it "did not warn defendant that the lease was terminable upon her failure to cure"]). Rather, the Improper Default Notices repeatedly stated that the Capital was reserving its right to "abate rent," which constitutes, among other things, the remedy elected by Capital one under Section 21.1 of the Lease.

124.    Accordingly, pursuant to Section 31.1 of the Lease and controlling New York law, the Improper Default Notices were not "effective" to serve as a predicate notice for terminating the Lease under Section 21.1 (*see Lurzer GMBH v. Am. Showcase, Inc.*, 75 F.Supp.2d 98, 102 [S.D.N.Y. 1998], *aff'd*, 201 F.3d 431 [2d Cir. 1999] ["when a party seeks the draconian remedy of forfeiture based on another party's failure to respond to a notice of default, the notice in question will be scrutinized carefully and any inadequacy, no matter how trivial, will defeat the claim."]).

125.    On January 15, 2020, our attorneys Rivkin Radler did send Defendant's counsel McCarter & English a response to Capital One's January 8, 2020 notice.  In that correspondence, Rivkin Radler stated: "Our office is counsel for JTRE with respect to the [Lease] and, as such, all future correspondence relating to this matter should be directed to our office."  Additionally, JTRE claimed that it had "no obligation under the Lease or otherwise to provide supplemental heat to any portion of [Unit C1]."  A true and accurate copy of the correspondence is provided herewith as <u>Exhibit 30</u>.  The purpose of this provision was to have all dispute-related correspondence directed to new counsel and not to our former attorneys. This <u>was not</u> nor ever intended to modify the Lease notice provision.

### The Lease Did Not Terminate Effective as of October 30, 2021

126.    Alternatively, the February 25, 2020 Letter notified Rivkin Radler that, if JTRE "disputes [Capital One's] right to terminate the Lease [as of June 30, 2021], this letter will **serve as notice of [Capital One's] right to early termination pursuant to Section 3.2 of the Lease**." Section 3.2 of the

Lease, entitled "Tenant Termination Right" provides that:

> "Tenant shall have the right to terminate this Lease effective as of the expiration of the sixth (6th) lease year of the Lease Term (the "Early Termination Date"), provided that Tenant **delivers to Landlord written notice** (the "Early Termination Notice") of such election not less than twelve (12) months prior to the Early Termination Date (the "Notice Date"). If Tenant timely delivers the Early Termination Notice on or before the Notice Date in accordance with this Lease, then this Lease shall terminate as of the Early Termination Date … **If Tenant does not deliver the Early Termination Notice on or before the Notice Date in accordance with this Lease, then Tenant shall be deemed to have waived its right to terminate the Lease as set forth in this Section 3.2, and such early termination right shall be void and of no further force and effect** (emphasis added).

127.     However, like the Improper Default Notices, the February Letter was ineffective, as a matter of law, to terminate the Lease pursuant to Section 3.2 of the thereof.

128.     As noted, Section 31.2 of the Lease—entitled "Addresses"—unequivocally provides that written notices must be served "at the addresses listed in the Notice Addresses section of the Key Provisions Summary or to another Addressee or at another address as designated by a party in a Notice pursuant to this Section 31" (underline in original). Moreover, Section 31.3—titled "Effectiveness of a Notice"—unequivocally provides that "a Notice **is effective only if** (A) the party giving the Notice has complied with Sections 31.1 and 31.2 above and (B) the Notice is deemed to have been received by the Addressee as provided below."

129.     Accordingly, the February 25, 2020 Notice was ineffective, because it failed to comply with Section 31 of the Lease as it was not addressed to the JTRE Notice Address; rather, it was sent to Rivkin Radler (*see Brueckner v. You Can Beam LLC*, 2021 WL 2158733, at *4 [S.D.N.Y. 2021] ["When a contract's terms include a procedure for termination, here applicable New York law demands strict compliance with that procedure"]; *LG Cap. Funding, LLC v. MineralRite Corp.*, 2017 WL 9250297, at *11 [E.D.N.Y. 2017] ["the law disfavors forfeiture and that in the construction of all contracts under which forfeitures are claimed, it is the duty of the court to interpret them strictly in order to avoid such a result."]; *see also Core Services Group, Inc. v. Teams Housing Development Corp. Fund, Inc.*, 2016 WL 4490626, at

*9 [N.Y. Sup. Ct., 2016] ["to operate as a sufficient notice of an option to terminate under a lease, there must be strict compliance with its terms and anything else is ineffective."], *citing A. Dubois & Son v Goldsmith Bros.*, 273 AD 306, 309 [1st Dept 1948]).

130.    In addition to Capital One's failure to comply with the Notice provision of the Lease, the February 25, 2020 Letter did not state that Capital One was *exercising* its right to terminate the Lease. Rather, it merely stated that the letter shall "serve as notice <u>of</u> [Capital One's] right to early termination pursuant to Section 3.2 of the Lease."  Put into context of the letter writing between counsel regarding Capital One's complaints about conditions in the Premises, the February Letter could be read as a mere threat.  This point is made clear in Rivkin Radler's response to the February Letter, which demonstrates that JTRE's counsel did not perceive the February Letter to properly exercise the early termination right, pursuant to Section 3.2 of the Lease.  Accordingly, the February Letter could not have provided "actual notice" to JTRE that Capital One was exercising its right to terminate the Lease, notwithstanding Capital One's admitted failure to comply with the Lease regarding the way that it must do so.

## Capital One's Counterclaim

131.    JTRE asserts that, at a maximum, it will be liable to Capital One for the sum of $160,978.34, which consist of damages alleged by Capital One that post-date the Estoppel Certificate (executed on May 7, 2018). As noted, Capital One's sole counterclaim alleges that, based on JTRE and Prior Landlord's defaults under the Lease, Capital One incurred certain costs and expense totaling $366,545.37. Specifically, Capital One alleges that JTRE failed to, inter alia, provide adequate heating and air conditioning and failed to maintain and/or repair the HVAC system and failed to maintain the Building in accordance with comparable building standards.  However, of the $366,545.37 in damages claimed by Capital One, $205,567.03 relate to expenses incurred before May 7, 2018, when Capital One issued the Estoppel Certificate to JTRE. On the other hand, $160,978.34 of Capital One's claimed damages relate to expenses incurred after the Estoppel Certificate was issued and after JTRE purchased the Building. As noted, the Estoppel Certificate affirmed that "neither tenant, nor to tenant's knowledge, the landlord, is in

default under any of the terms and conditions of the Lease." The Estoppel Certificate also affirmed that Capital One understood that JTRE was "relying upon the representation" made.

132.     Therefore, given that Capital One acknowledged in the Estoppel Certificate that "the landlord, is [not] in default under any of the terms and conditions of the Lease," and because none of alleged "defaults" were Plaintiff's responsibilities under the Lease, Capital One cannot prevail on its breach of contract counterclaim for alleged breaches by JTRE that pre-date the Estoppel Certificate and, for the reasons provided above, all counterclaim damages alleged.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:      New York, New York
            February 28, 2023

Jack Terzi

Respectfully submitted by:

The Law Firm of Jeffrey S. Dweck, P.C.

By:  Jeffrey Dweck (JD 6658)

43 West 33rd Street, Suite 304
New York, New York 10001
(212) 967-0500
Attorneys for Plaintiff
JTRE Manhattan Avenue LLC and JTRE 807 Manhattan
Avenue LLC