Jeffrey Dweck, Esq.
THE LAW FIRM OF JEFFREY S. DWECK, P.C.
43 West 33rd Street, Suite 304
New York, New York 10001
(212) 967-0500
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JTRE MANHATTAN AVENUE LLC and JTRE 807 MANHATTAN AVENUE LLC,<br><br>                           Plaintiff,<br><br>     -against-<br><br>CAPITAL ONE, N.A.,<br><br>                           Defendant. | Case No. 21-CV-05714 (JLR) |

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Dated:   New York, New York
         February 28, 2023

                                        THE LAW FIRM OF JEFFREY S. DWECK, P.C.
                                        By:  Jeffrey Dweck (JD 6658)

                                        43 West 33rd Street, Suite 304
                                        New York, New York 10001
                                        (212) 967-0500
                                        Attorneys for Plaintiff
                                        JTRE Manhattan Avenue LLC and JTRE 807 Manhattan Avenue LLC

## PRELIMINARY STATEMENT

This is an action for money damages arising from a lease between JTRE, as successor-in-interest to the landlord, and the Defendant Capital One, N.A. (the "Capital One"), as tenant and Capital One's clear breach of the subject lease when it vacated early and stopped paying rent, and its refusal to comply with the lease's unequivocal contractual obligations.

## SUMMARY OF FACTS

The facts of the case are contained in the Declaration of Jack Terzi submitted herewith and in the Plaintiff's Rule 56.1 Statement of Undisputed Facts.

In sum, the parties to this case are parties to a long-term lease agreement (the "Lease") between Plaintiffs, as Landlord, and Defendant, as Tenant. The Premises had previously been owned by Capital One bank (since around 2006) who sold it to Plaintiff's predecessor-in-interest, taking a lease back for the subject premises. Under the Lease terms, Capital One rented the ground floor commercial condominium unit (the "Premises") located at 807 Manhattan Avenue, Brooklyn, New York (the "Building"), for a term expiring on October 31, 2035. Terzi, ¶¶8-10.

The building at issue, 807 Manhattan Avenue, Brooklyn, New York was in the process of undergoing a condominium conversion whereby the building was to be split into two (2) condominium units – a multi-unit residential component and a commercial component. The project was to be named "807 Manhattan Avenue Condominium." 807 Manhattan Avenue LLC ("Slate") was to be the owner of the residential portion ("Commercial Unit 2" or "C2") and the Plaintiff's predecessor in interest the owner f the Commercial Unit "C2") which is the subject of the Lease. Terzi, ¶¶15-16.

As part of the conversion, Slate, as the residential owner, agreed to provide the commercial unit – the premises at issue – a new heating, ventilation and air conditioning ("HVAC") system. See Terzi, ¶17. They further agreed to do so at their sole expense and with no adverse effect on Plaintiff or its

tenant. Id. The Lease actually contemplated the Condominium conversion and provided, for example, that "Tenant acknowledges that Landlord intends to convert the Property to a Condominium form of ownership …. Tenant acknowledges that to complete the Condominium conversion, the Building may undergo construction, alterations, additions or improvements which may consist of demolition or cause excessive nose, vibrations, dust, debris and the eviction of scaffolding or other protective measures …." Terzi, ¶18.

Ultimately, Plaintiff acquired the property and, with it, the Lease. Surprisingly, only a few months later (less than five months after closing), and despite the Estoppel Certificate, Capital One began sending Plaintiff ("JTRE") letters asserting that certain conditions existed in the Premises that violated the Lease, which JTRE promptly addressed. Specifically, on October 19, 2018, Capital One sent JTRE a notice of default claiming several breaches of the Lease relating to inadequate heating in the Building. The notice of default claimed that Capital One had incurred supplemental heating costs during the winter of 2017-2018 due to the Building's inadequate heat and demanded that JTRE reimburse it for those costs, in excess of $200,000.00. Notably, the alleged heating failures about which Capital One initially complained had occurred while the prior owner owned the Building. Terzi, ¶¶27-30

To be clear, the condition causing the alleged lack of adequate heat to the Premises arose prior and was known to Capital One when it issued the estoppel certificate. The fact that Capital One had incurred over $200,000.00 in heat-related costs the winter before JTRE purchased the Building also was known to Capital One when it issued the estoppel certificate. Yes, in its October 19, 2018 letter, Capital One decided despite this that the alleged insufficient or heat and JTRE'S failure to reimburse Capital One's heating costs were defaults by the landlord under the Lease. Terzi, ¶¶29-31.

3

**The Lease Is Clear As To the Parties' Responsibilities and Capital One Continuously Mischaracterized Them**

The Lease document makes it abundantly clear, per Sections 10.1 and 12.2, that the landlord bears no responsibility for the functioning, repair, or maintenance of the heating system. As such, Capital One's prior claims against JTRE and, to the extent such a claim may be asserted against Plaintiff as successor-in-interest to JTRE, are without merit. Terzi, ¶33.

Specifically:

i. According to Section 10.2 of the Lease, the Landlord is responsible to maintain, foundations, exterior surfaces, paint, plumbing system to the connecting point of the meters, the electrical system to the connecting point of the meters, all structural systems, roof membrane (including interior ceiling, inventory and other personal property if damaged by leakage emanating from the portion of the MA Building outside of the Premises or from the Calyer Building leaking into the ATM space, etc.).

ii. Under Section 10.1 (Maintenance and Repairs by Tenant) the Tenant is charged with maintaining the heating, ventilating and air-conditioning system including the maintenance and replacement of the boiler unit, which expressly serve the premise, HVAC, whether located within or outside of the Premises, pursuant to a maintenance contract.

iii. Section 10.4 reiterates that the Landlord "shall not be liable for any failure on the part of the owner and Condo Board."

iv. Under Section 12.2 (Landlord's Obligations), the Lease makes clear that while the Landlord does have obligations to repair structural problems, "however, Landlord shall not be responsible for any fault of Owner or the Condo Board."

v. Section 12.3 of the Lease precludes any suit for damages against the Landlord where utilities or services are interrupted or terminated because of repairs, installations, improvements or any cause beyond Landlord's reasonable control. The Lease makes clear that any such interruption or termination <u>does not</u> relieve the Tenant from performance of any of its obligations thereunder, including the obligation to pay rent.

vi. Section 34.1 further provides that "Tenant acknowledges that Landlord intends to convert the Property to a Condominium form of ownership …. Tenant acknowledges that to complete the Condominium conversion, the Building may undergo construction, alterations, additions or improvements which may consist of demolition or cause excessive nose, vibrations, dust, debris and the eviction of scaffolding or other protective measures …." … "Landlord agrees to use commercially reasonable efforts to minimize interference with the conduct of

4

> Tenant's business. …"

Terzi, ¶34. Capital One knew about and had been dealing with heating issues before JTRE ever entered the scene. Even after JTRE became involved, Capital One had always corresponded with Slate with respect to these issues and Slate, in turn, had been dealing with them. Terzi, ¶35.

Notwithstanding, JTRE worked closely with the Capital One to help investigate rectify their heating issues.  They held meetings, exchanged hundreds of emails, coordinated and attended meetings and followed up. Terzi, ¶¶37-40.

In the meantime, counsel for Plaintiff responded to Capital One and made clear that the insufficient heating was Capital One's responsibility under Section 10.1 of the Lease (or Slate's), not JTRE's.  Capital One actually notified its prior landlord that in its view the system installed by Slate was "at best inadequate and at worst faulty." Terzi, ¶48.  Over November and December of 2019, while the parties worked through the issues, Capital One was sending emails, again mischaracterizing the parties' responsibilities (Terzi, ¶¶53-55) until counsel for Plaintiff clarified that "[JTRE] is not obligated under the Lease or otherwise to provide heat to [Unit C1]," and "[JTRE] has no duty to [Capital One] to provide heat in the first instance . . . ." Terzi, ¶56.  Thereafter, and presumably understanding that they were barking up the wring tree, Capital One emailed counsel for JTRE asking JTRE to join them in sending a Joint Letter that they would draft to Slate about conditions at the property. Terzi, ¶57.

**Capital One's Attempted Escape**

Ultimately, on February 25, 2020, Capital One's attorney wrote a letter to JTRE's prior counsel asserting that Capital One was terminating the Lease effective as of June 30, 2020, because JTRE allegedly failed to cure "lease defaults" which pre-dated JTRE's ownership, notwithstanding the Estoppel Certificate and notwithstanding the clear Lease provisions.  The attorney's February 2020 letter also asserted – as an alternative in case their allegations of default failed – that Capital One was

5

exercising their early termination option to terminate the lease effective as of October 31, 2021. We respectfully submit that such a letter cannot be sent in the alternative inasmuch as the two positions are mutually exclusive if not contradictory. Terzi, ¶¶62-64.

As stated above, however, there was no Lease default and therefore no grounds to terminate.

Further, the letter was not served in accordance with the Lease "Notices" provision. There is no dispute on that issue (Defendant's claim is that inasmuch as JTRE received actual notice, the letter complied).

## DISCUSSION

### Legal Standard

Summary Judgment Legal Standard Federal Rule of Civil Procedure 56 ("Rule 56") states that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. Summary judgment is appropriate where, upon motion of one party, the non-moving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)*. Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials . . . and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Rose v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008) (quoting Fed. R. Civ. P. 56(c))*.

In deciding a motion for summary judgment, the Court may consider all facts in the record before it. *Id. at 323*. When a motion for summary judgment is properly supported by evidence, the party opposing a motion for summary judgment "may not rest upon mere allegations or denials -- rather, he must present sufficient probative evidence to establish a genuine issue of material fact." *Horror Inc. v. Miller, 15 F.4th 232, 240 (2d Cir. 2021)*. The court must grant summary judgment

where the nonmovant's evidence is merely colorable, conclusory, speculative, or not significantly probative. *Anderson v. Liberty Lobby Inc., 477 U.S. 242, 249-50 (1986).*

"When both sides have moved for summary judgment, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Lyons v. Lancer Ins. Co., 681 F.3d 50, 56 (2d Cir. 2012).* If the movant "demonstrates the absence of a genuine issue of material fact . . . the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011)* (internal quotation marks and citations omitted).

### Capital One's Failure to Pay Rent Was A Breach of the Subject Lease

The elements of a claim for breach of a contract or a lease under New York law are: (a) the existence of a valid, binding lease; (b) landlord's performance thereunder; (c) tenant's failure to pay rent (or other breach); and (d) damages suffered by landlord as a result of the breach. *CAI Rail, Inc. v. Badger Mining Corp., 2021 U.S. Dist. LEXIS 32564, *11 (S.D.N.Y. 2/22/2021); Hugo Boss, supra, 149 N.Y.S.3d at 818.*

A commercial contract negotiated at arm's length by sophisticated business people represented by counsel should be enforced according to its terms. *Mod. Art Servs., LLC v. Fin. Guar. Ins. Co., 161 A.D.3d 618, 620 (1st Dept. 2018).* Failure to timely pay rent constitutes breach of a material term of a lease. *Madison Ave. Leasehold, LLC v. Madison Bentley Assoc., LLC, 8 N.Y.3d 59, 65 (2006).* "The obligation to pay rent pursuant to a commercial lease is an independent covenant, and thus, cannot be relieved by allegations of a landlord's breach, absent an express provision to the contrary." *Universal Comm. Network, Inc v. 229 W. 28th Owner, LLC, 85 A.D.3d 668, 669 (1st Dep't 2011).* Here, there is no dispute that the Lease is valid; therefore, it must be enforced according to its terms. There is no dispute that Capital One failed to pay Rent due under the terms of the Lease; instead, Capital One

relies upon its defective attempted termination (which was barely unequivocal inasmuch as it "hedged" by stating it had an early termination right even if it had no right to terminate for default). The Plaintiff performed all of its obligations under the Lease.

Simply stated, there is no genuine issue of fact that Capitol One failed to pay Rent due under the Lease.

### Capital One's Breaches

There is no dispute that on or about March 20, 2020, Capital One ceased operating at the Premises and vacated the Premises and that Capital One ceased tendering rent payments after June 30, 2020, having made the decision at that time to repudiate the Lease in its entirety.

Since the Lease was still in full force and effect and Capital One had breached its terms, in January of 2020, JTRE asserted its rights and remedies against Capital One by terminating the Lease, based on Capital One's rent default. Capital One's breach of the Lease has caused JTRE to incur damages and, consequently, to default under its mortgage for the Premises. The Terzi Declaration set forth the damages it incurred and the damages it is entitled to under the Lease.

Moreover, after Capital One vacated the Premises, it failed to comply with its Lease obligations to restore the Premises to its original condition. To this end, Article 14 of the Lease provides, in pertinent part, that at the expiration of the Lease or earlier termination thereof, Capital One was required to "remove its trade fixtures, security deposit box assemblies, ATMs, signs, and all other personal and/or proprietary property (collectively, "Tenant's Trade Fixtures")," and "repair any damage to the Premises or the Building caused by Tenant's removal of the same." Specifically, Capital One left behind two (2) bank vaults and all of their fixtures – safety deposit boxes, desks, and the like.

**Capital One's Alleged Termination Was Defective:  There Was No Lease Default on Landlord's Part**

As set forth above, the Lease is abundantly clear as to what the Landlord's responsibilities are, what Capital One's responsibilities were (maintenance of the HVAC, for example), and what Slate was responsible for.  Capital One specifically agreed to hold the Landlord harmless from the very type of claims it was making in its defective default notices and the very claims on the basis of which it ultimately tried terminating the Lease.

Thus, Capital One's defenses here are of no moment and summary judgment should be granted to the Plaintiff on the basis of Capital One's vacating, failure to pay rent and restore the Premises.

**Capital One Waived Any Claims By Virtue of an Estoppel Agreement**

Capital One executed the Tenant Estoppel Certificate, by which it certified to JTRE 807 that: "Neither [Capital One], nor to [Capital One's] knowledge, [Slate], is in default under any of the terms and conditions of the Lease."  Terzi, ¶22.  The Estoppel Certificate also affirmed that Capital One understood that JTRE was "relying upon the representation" made.  Indeed, one of the paramount purposes behind JTRE obtaining the representations from Capital One in conjunction with its transaction with JTRE was to estop Capital One from later raising claims against JTRE, as successor to JTRE, which Capital One knew or should have known at the time Capital One executed the estoppel certificate. Terzi, ¶23.

**The 'Written Notice' Provisions in the Lease**

Article 31 of the Lease, entitled "Notices," provides the precise manner in which written notice under the Lease is to be served. It provides, in pertinent part that:

> **31.1 Written Notice; Delivery Methods.** Each party giving or making any notice, request, demand, consent, approval, or other communication (each, a "Notice" (but sometimes "notice") pursuant to this Lease shall: (i) give the Notice in writing; (ii) cause the Notice to be signed by an authorized representative of

9

the sending party (the sending party's attorney is authorized to sign and send a Notice on behalf of the sending party); and (iii) use one of the following methods of delivery, each of which for purposes of this Lease is a writing: (a) personal delivery; (b) Registered or Certified Mail, in each case, return receipt requested and postage prepaid; or (c) nationally recognized overnight courier, with all fees prepaid.

**31.2 Addresses.** Each party giving a Notice shall address the Notice to the appropriate person at the receiving party (the "Addressee") at the addresses listed in the Notice Addresses section of the Key Provisions Summary or to another Addressee or at another address as designated by a party in a Notice pursuant to this Section 31.

**31.3 Effectiveness of a Notice.** Except as provided elsewhere in this Lease, **a Notice is effective only if (A) the party giving the Notice has complied with Sections 31.1 and 31.2 above** and (B) the Notice is deemed to have been received by the Addressee as provided below. A Notice is deemed to have been received by the Addressee as follows: (i) if a Notice is delivered in person, the date the personal delivery is made; (ii) if a Notice is delivered by a nationally recognized overnight courier, the next business day; (iii) if sent by Registered or Certified Mail, upon receipt by the Addressee *as* indicated by the date on the signed receipt; and (iv) if the Addressee rejects or otherwise refuses to accept the Notice, or if the Notice cannot be delivered because of a change in address for which no Notice was given, then upon the rejection, refusal, or inability to deliver the Notice (emphasis added).

After JTRE assumed the Lease from Prior Landlord, Capital One was served with a "Tenant Notice Letter," dated May 29, 2018 (the "Notice Letter"), which specifically advised Capital One, among other things, "to address any and all *notices* … to the landlord under or in connection with your lease to" JTRE at: c/o JTRE Holdings, LLC, 362 Fifth Avenue, 12th Floor, New York, New York 10001 (the "JTRE Notice Address"). Terzi, ¶120. There is no dispute that the February 25, 2020 letter was not sent in accordance with the terms of the Lease and this Tenant Notice Letter.

Among other things, Capital One's improper Default Notices:

- failed to comply with the Notice Letter and Article 31 of the Lease in that they were not properly served upon JTRE at the JTRE Notice Address;

10

- failed to specify a date in which JTRE was required to cure the defaults alleged therein (*see 542 Holding Corp. v. Prince Fashions, Inc.*, 46 AD3d 309, 311 [2007] ["The purpose of a notice to cure is to specifically apprise the [party] of claimed defaults in its obligations under the lease and of the forfeiture and *termination of the lease if the claimed default is not cured within a set period of time*"] [emphasis supplied]; see also *Favourite v. 55 Halley St., Inc.*, 381 F. Supp. 3d 266, Fn. 5 [S.D.N.Y. 2019] ["The purpose of a Notice to Cure is to specifically apprise the tenant of claimed defaults in its obligations under the lease and of the forfeiture and termination of the lease if the claimed default is not cured within a set period of time"]).

- did not advise JTRE that such notice was, in fact, a default notice under Article 21 of the Lease (*see id.*)

- Did not advised JTRE that if it failed to cure the alleged defaults by a date certain, Capital One reserved its right to terminate the Lease (*see 49 W. 12 Tenants Corp. v. Seidenberg*, 6 AD3d 243, 244 [1st Dept 2004] [predicate notice ineffective where it "did not warn defendant that the lease was terminable upon her failure to cure"]). Rather, the Improper Default Notices repeatedly stated that the Capital was reserving its right to "abate rent," which constitutes, among other things, the remedy elected by Capital one under Section 21.1 of the Lease.

Accordingly, pursuant to Section 31.1 of the Lease and controlling New York law, the Improper Default Notices were not "effective" to serve as a predicate notice for terminating the Lease under Section 21.1 (*see Lurzer GMBH v. Am. Showcase, Inc.*, 75 F.Supp.2d 98, 102 (S.D.N.Y. 1998), *aff'd*, 201 F.3d 431 (2d Cir. 1999) ("when a party seeks the draconian remedy of forfeiture based on another party's failure to respond to a notice of default, the notice in question will be scrutinized carefully and any inadequacy, no matter how trivial, will defeat the claim.")).

### The Lease Also Did Not Terminate Effective as of October 30, 2021

Alternatively, the February 25, 2020 Letter notified Rivkin Radler that, if JTRE "disputes [Capital One's] right to terminate the Lease [as of June 30, 2021], this letter will **serve as notice of [Capital One's] right to early termination pursuant to Section 3.2 of the Lease**." Section 3.2 of the Lease, entitled "Tenant Termination Right" provides that:

> "Tenant shall have the right to terminate this Lease effective as of the expiration of the sixth (6th) lease year of the Lease Term (the

11

> "Early Termination Date"), provided that Tenant **delivers to Landlord written notice** (the "Early Termination Notice") of such election not less than twelve (12) months prior to the Early Termination Date (the "Notice Date"). If Tenant timely delivers the Early Termination Notice on or before the Notice Date in accordance with this Lease, then this Lease shall terminate as of the Early Termination Date … **If Tenant does not deliver the Early Termination Notice on or before the Notice Date in accordance with this Lease, then Tenant shall be deemed to have waived its right to terminate the Lease as set forth in this Section 3.2, and such early termination right shall be void and of no further force and effect** (emphasis added).

However, like the Improper Default Notices, the February Letter was ineffective, as a matter of law, to terminate the Lease pursuant to Section 3.2 of the thereof. As noted, Section 31.2 of the Lease—entitled "Addresses"—unequivocally provides that written notices must be served "at the addresses listed in the Notice Addresses section of the Key Provisions Summary or to another Addressee or at another address as designated by a party in a Notice pursuant to this Section 31" (underline in original). Moreover, Section 31.3—titled "Effectiveness of a Notice"—unequivocally provides that "a Notice **is effective only if** (A) the party giving the Notice has complied with Sections 31.1 and 31.2 above and (B) the Notice is deemed to have been received by the Addressee as provided below."

Accordingly, the February 25, 2020 Notice was ineffective, because it failed to comply with Section 31 of the Lease as it was not addressed to the JTRE Notice Address; rather, it was sent to Rivkin Radler *(see Brueckner v. You Can Beam LLC, 2021 WL 2158733, at \*4 (S.D.N.Y. 2021)* ("When a contract's terms include a procedure for termination, here applicable New York law demands strict compliance with that procedure"); *LG Cap. Funding, LLC v. MineralRite Corp., 2017 WL 9250297, at \*11 (E.D.N.Y. 2017)* ("the law disfavors forfeiture and that in the construction of all contracts under which forfeitures are claimed, it is the duty of the court to interpret them strictly in order to avoid such a result."); see also Core Services Group, Inc. v. Teams Housing Development Corp. Fund, Inc., 2016 WL 4490626, at \*9 (N.Y. Sup. Ct., 2016) ("to operate as a sufficient notice of

an option to terminate under a lease, there must be strict compliance with its terms and anything else is ineffective."), *citing A. Dubois & Son v Goldsmith Bros., 273 AD 306, 309 (1st Dept 1948)*).

In addition to Capital One's failure to comply with the Notice provision of the Lease, the February 25, 2020 Letter did not state that Capital One was *exercising* its right to terminate the Lease. Rather, it merely stated that the letter shall "serve as notice of [Capital One's] right to early termination pursuant to Section 3.2 of the Lease."  Put into context of the letter writing between counsel regarding Capital One's complaints about conditions in the Premises, the February Letter could be read as a mere threat.  This point is made clear in Rivkin Radler's response to the February Letter, which demonstrates that JTRE's counsel did not perceive the February Letter to properly exercise the early termination right, pursuant to Section 3.2 of the Lease.  Accordingly, the February Letter could not have provided "actual notice" to JTRE that Capital One was exercising its right to terminate the Lease, notwithstanding Capital One's admitted failure to comply with the Lease regarding the way that it must do so.

## Capital One's Counterclaim

As noted, Capital One's sole counterclaim alleges that, based on JTRE and Prior Landlord's defaults under the Lease, Capital One incurred certain costs and expense totaling $366,545.37. Specifically, Capital One alleges that JTRE failed to, inter alia, provide adequate heating and air conditioning and failed to maintain and/or repair the HVAC system and failed to maintain the Building in accordance with comparable building standards.

However, of the $366,545.37 in damages claimed by Capital One, $205,567.03 relate to expenses incurred before May 7, 2018, when Capital One issued the Estoppel Certificate to JTRE. On the other hand, $160,978.34 of Capital One's claimed damages relate to expenses incurred after the Estoppel Certificate was issued and after JTRE purchased the Building. As noted, the Estoppel Certificate affirmed that "neither tenant, nor to tenant's knowledge, the landlord, is in default under any

of the terms and conditions of the Lease." The Estoppel Certificate also affirmed that Capital One understood that JTRE was "relying upon the representation" made. Terzi, ¶130.

Therefore, given that Capital One acknowledged in the Estoppel Certificate that "the landlord, is [not] in default under any of the terms and conditions of the Lease," and because none of alleged "defaults" were Plaintiff's responsibilities under the Lease, Capital One cannot prevail on its breach of contract counterclaim for alleged breaches by JTRE that pre-date the Estoppel Certificate and, for the reasons provided above, all counterclaim damages alleged. Terzi, ¶131.

## CONCLUSION

For the reasons stated above, Plaintiff respectfully asks that this Court grant Plaintiff's motion for summary judgment on its breach of contract claim and grant summary judgment dismissing Defendants' counterclaim.

Dated:   New York, New York
         February 28, 2023

THE LAW FIRM OF JEFFREY S. DWECK, P.C.
By: Jeffrey Dweck (JD 6658)

43 West 33rd Street, Suite 304
New York, New York 10001
(212) 967-0500
Attorneys for Plaintiff
JTRE Manhattan Avenue LLC and JTRE 807 Manhattan Avenue LLC