Jeffrey Dweck, Esq.
THE LAW FIRM OF JEFFREY S. DWECK, P.C.
43 West 33rd Street, Suite 304
New York, New York 10001
(212) 967-0500
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JTRE MANHATTAN AVENUE LLC and JTRE 807 MANHATTAN AVENUE LLC,<br><br>                    Plaintiff,<br><br>       -against-<br><br>CAPITAL ONE, N.A.,<br><br>                    Defendant. | Case No. 21-CV-05714 (JLR) |

**DECLARATION OF MORRIS TERZI IN SUPPORT OF PLANITIFF'S MOTION FOR SUMMARY JUDGMENT**

MORRIS TERZI, duly affirming under the penalties of perjury, states as follows:

1. I am MORRIS TERZI, employed by the Plaintiffs JTRE Manhattan Avenue LLC and JTRE 807 Manhattan Avenue LLC (together, "JTRE") and I have knowledge with respect to the events and circumstances surrounding this action, as set forth below.

2. I make this Declaration in further support of the Plaintiffs' motion for summary judgment and in opposition to Defendant's motion for summary judgment.

3. The Defendant argues that various admissions were made during the deposition testimony of both myself and Jack Terzi.

4. To the extent, for example, that I made any statement agreeing that JTRE was obligated to provide heat or make repairs, I was either simply wrong (the Lease would govern, not my deposition testimony) or I was speaking in general terms and not, for example, where an intervening cause (Slate) was involved.

5. Thus, in response to the Defendant's Rule 56.1 Statement No. 39, I was not referring

specifically to the circumstances herein, which would not be governed by my deposoition testimony, but by §10.4 (Landlord not liable for any failure of the Condo Board…, §12.2 (Landlord not obligated for failures of … Condo Board), §12.3 and §34.1 of the Lease.

6. Also, in the very deposition conversation being quoted (Pages 42-44), I did say:

> Q. Okay. And by heat -- by heat, you just mean some heat? There's not a particular temperature or a comfort level that you think the tenant was entitled to?
> A. I'm not sure. You can check the -- we can look at the lease. I'm not sure.

7. I also indicated that:

> A. I recall them complaining about lack of heat, yes.
>
> Q. And do you recall them complaining that the temperature would get down to 57 degrees on occasion because the heat didn't work?
> A. I recall them complaining. I do not know the exact degree that they mentioned.
>
> Q. Okay. And do you recall that Capital One asked you, as the landlord, to fix the heating issue?
> A. Yes.
>
> Q. And you, as the landlord, did not fix the heating issue, correct?
> A. No, that is not correct.
>
> Q. Okay. Did you hire -- did you -- let me back up.  What did you do? What did the landlord do to fix the heating issue?
> A. There was a new heating system being installed by Slate as per the lease and the condominium documents in which we were facilitating with and helping. And throughout that time, Randy Levitt and Capital One was working together with us on the systems that they wanted to install.

(Page 32-33)

and

> Q. And what, if anything, did you as landlord do to remediate these five issues?
> A. These issues were a result in the condominium being built to the side and above us in certain parts of the building. So we assisted to getting any of these concerns rectified and cleared up by the responsible parties.

and

> Q. Okay. But you were the landlord. You were responsible as to the tenant to fix these issues, right?
> A. The tenant was responsible to – the tenant, as tenant, was also responsible for the condominium bylaws, and this was a result of the condominium work being done. So together with the tenants and the condo, we worked to rectify any of these issues.

8. On Page 59 of my deposition I also testified as follows:

> Q. Did you hire anybody to go out and fix the roof, fix the bathroom, or fix the HVAC?
> A. Fix the HVAC, no, as it was Slate's responsibility. And we did hire somebody to review it with us.  We had somebody that we brought on to help facilitate with Slate. We did have work done to the plumbing to the bathroom. And the roof, we had -- I believe we had somebody look at it, but it was ultimately Slate who did the work.
>
> Q. Did you pay Slate?
> A. No, as it's their responsibility.

(Page 59)

> Q. And because you thought this third party should do it, you didn't -- you, the landlord -- didn't hire anybody to do it, and you didn't reimburse Capital One for the costs that they incurred, did you?
> A. We hired somebody to supervise it. We hired someone to do minor work, but it was ultimately Slate's responsibility, and Slate paid for the repairs.

(Page 61)

9. and

> A. Slate represents the condominium and the lease, I believe, references the bylaws, and that is a part of the condominium.
>
> Q. So are you telling me that as the landlord, you have no responsibility for these items, or you're acknowledging that you do but --
> A. We have responsibilities to our tenant.
>
> Q. Okay.
> A. And we worked with our tenant and Slate, as we were in the middle, to fix any of the issues

(Page 61)

10. I specifically made clear in my deposition that "**Slate was responsible in fixing the entire roof.**"  (Page 31, emphasis added)

11. Indeed, throughout the entire tenancy, I did everything in my power to enlist Slate's cooperation and to intervene as best I could to satisfy any and all of Capital One's complaints or assertions.

12. See also this email from Capital One to JTRE, among others, which is truly and accurately reproduced here:

3

> From: Danielle Gaudio <danielle.gaudio@capitalone.com>
> Sent: Monday, January 28, 2019 12:01 PM
> To: Morris Terzi <mt@jtreholdings.com>
> Cc: catherine.ardolina@capitalone.com; Jeffrey Yachmetz <jyachmetz@slatepg.com>; Paul Woody <pwoody@slatepg.com>; Jack Terzi <jack@jtreholdings.com>; Levitt, Randy (BANK) <Randy.Levitt@capitalone.com>; Danielle M. Gaudio <Danielle.Gaudio@capitalone.com>
> Subject: Re: [External Sender] 807 Manhattan Avenue - Capital One
>
> Morris,
>
> At this point I'm not sure what there is to discuss. Slate is well aware of the work that we had to do to ensure our branch was free from the outside elements.
> We had 2 meetings, numerous phone calls and emails were exchanged, before you purchased the property, in reference to the invoices. Slate has been supplied all the invoices and any other documentation they requested.
>
> Thank you
> Danielle M. Gaudio
> Sr. Transaction Manager
> Network Management
>
> 131 Portion Road
> Ronkonkoma, NY 11779
> Cell   631 219-6901
> Danielle.Gaudio@CapitalOne.com

13.   Defendant also alleges that JTRE admitted that the "Comparable Building Standard" obligated it to provide certain minimum temperatures. See Defendant's Rule 56.1 Statement, No. 45. During my testimony, Defendant's counsel never indicated that "Comparable Building Standard" was a defined term in the Lease and never provided the applicable definition and instead asked me if I knew what it meant. At that point I speculated (wrongly) that it had to deal with building temperatures, apparently mistaking it for the NYC Building Code.

14.   Counsel did it again in Page 63 where, notably, I did not even give a definitive answer:

> Q. The comparable building standards, you'd agree, require that the building not have a leaky roof, right?
> A. I would believe so.
>
> Q. And that the building have running hot and cold water, right?
> A. I would believe so.

15.   Again, in Statement No. 54, Defendant argues that "JTRE admitted that it failed to maintain the requisite minimum temperature," which is a misstatement and out of context. I only said that at times the

temperatures were substandard, **not** that "JTRE failed to maintain" them.

16. In Statement No. 59, my deposition testimony is being misused again. Defendant argues that "JTRE received Capital One's December 20, 2018 notice and agreed with Capital One's allegations about the insufficient heat" when in reality JTRE never agreed there was a default. This statement suggests that JTRE took responsibility as opposed to merely acknowledging the condition. Also, not all of Capital One's "allegations of insufficient heat" were admitted. Finally, I was never asked to opine as to whose responsibility those were or who caused the issues in the first place.

17. The emails annexed hereto as <u>Exhibit 37</u> are true and accurate copies of our attorney's response to the December 20, 2018 letter.

18. Defendant repeats its pattern in Statement No. 61 where it asserts that "JTRE received Capital One's July 19, 2019 notice and agreed with Capital One's allegations about the insufficient heat…" I never agreed with Capital One's allegation of insufficient heat. <u>These are mis-quotes</u>. I was simply "agreeing" that that was what the letter said:

```
 8   Q  I'd like to take your attention to
 9  Exhibit 1, tab 13, please. It's another notice of
10  default, fifth notice of default, dated July 19,
11  2019.
12       Do you see that?
13   A  Yes.
14   Q  And did you receive a copy of this at or
15  around the time of this date?
16   A  I believe so.
17   Q  And it restates many of the same problems
18  we've already talked about, correct? Roof leaks.
19  HVAC problems. Lack of water at the premises.
20  And other problems, like loss of power.
21       Do you see that?
22   A  I'm looking through it now.
23   Q  Okay.
24   A  Yes.
```

19. Defendant also asserts that "JTRE received Capital One's December 12, 2019 notice and agreed with Capital One's allegations about the insufficient heat." My testimony was as follows:

5

> Q. What was your reaction to that communication and the information that was provided to you?
> A. December 2019 I was dealing with Capital One and Randy Levitt on an almost daily basis, so I assume this was addressed at the time, but I don't recall.
>
> Q. Okay. But as of December 2019, the date of this document -- December 12, 2019 -- you'd agree that the HVAC issues had not been solved and the property was still very cold?
> A. As of December 2019, I believe there was a plan in place, but it was not fully completed.
>
> Q. Okay. But as a result of that plan, whatever it was not being completed, the HVAC problems remained in place, and the property was colder than it should have been, right?
> A. Correct.

(Page 101)

20. Jumping to Statement No. 94, Defendant asserts that "JTRE received Capital One's January 8, 2020 notice and agreed with Capital One's allegations about the insufficient heat." I had been testifying there as to multiple conditions, making the question a compound question:

> Q. It says, in fact, the defaults have been ongoing and remain uncured. The business disruptions, property damage, threats to employee health and safety, and the defective status of the HVAC system has continued. That statement was true as of January 2020, wasn't it?
> A. Yes.
>
> Q. So the prior defaults had not been cured, and the problems at the property, including the HVAC system, had continued through January of 2020, right?
> A. Yes.

21. Defendant asserts the same with respect to a February 25, 2020 letter and argues that I "agreed with Capital One's allegations about the insufficient heat." I dispute this characterization as not giving full context. Excluded from the Statement was:

> … and that was true as of February 25, 2020, correct?
> A. There were -- there were defaults, correct.
>
> Q. Right. There had been defaults and those issues had remained uncured through this date, February 25, 2020, right?
> A. If you are asking if the HVAC and roof were uncured, yes.
>
> Q. Okay. Those issues about which you received notices of default remained unfixed/uncured as of the date of this letter, February 25, 2020; isn't that right?
> A. They were all in process, yes.
>
> Q. Okay.
> A. They were ongoing.

(Page 104)

22. Defendant argues that "The lack of heating 'did not get fixed.'" This is also not accurate or in

6

context.  **S**upplemental heating was obtained and provided throughout the Lease term. *See, e.g. Levitt Decl. ¶¶ 59, 60.  Note that ¶ 28 of the Levitt Decl. speaks to conditions in October 2018, which receded the remedial measures described in ¶¶ 59 and 60.*  See also my Deposition at Pages 32-33 where I testified:

> Q. What did you do? What did the landlord do to fix the heating issue?
> A. There was a new heating system being installed by Slate as per the lease and the condominium documents in which we were facilitating with and helping. And throughout that time, Randy Levitt and Capital One was working together with us on the systems that they wanted to install.

*and on Pages 33-34:*

> The heating system -- just to take a step back, the heating system was installed, I believe, in 2018, '19. And per Capital One's request, we facilitated to making modifications and upgrades to that existing heating system.
> Q. When you say "Capital One's request," is what you mean to describe Capital One's complaint that the heating system wasn't working and there was not heat in the premises?
> A. There was always heat in the premises. If it wasn't to their liking, that's what we were helping with. And in 2019 -- throughout 2019 we were meeting with Capital One onsite biweekly with Slate to look at the progress of the system that they were installing.

23. In response to Defendant's Statement Nos. 76-79, JTRE cited the following emails, all of which are true and accurate copies and show remedial measures being undertaken:

```
From:          Catherine Ardolina (CONT) [catherine.ardolina@capitalone.com]
on behalf of   Catherine Ardolina (CONT) <catherine.ardolina@capitalone.com> [catherine.ardolina@capitalone.com]
Sent:          8/29/2018 11:45:23 AM
To:            pwoody@slatepg.com
CC:            mt@jtreholdings.com; jack@jtreholdings.com; Danielle Gaudio [Danielle.Gaudio@capitalone.com]
Subject:       Re: [External Sender] Leaks 807 Manhattan
```

Paul, Thanks for the heads up.  Morris, Jack, we also had a large amount of water in the elevator pit that knocked out the elevator. We had to get Warren Elevator to pump it out and make repairs in order to get the elevator operational again.

On Wed, Aug 29, 2018 at 10:37 AM Paul Woody <pwoody@slatepg.com> wrote:
> Morris and Jack,
>
> I was just told there's a leak in the domed part of your building. See attached photo. Please reach out to Capital One directly to coordinate repair.

7

> **From:** USMAN MUSHTAQ [usman.mushtaq@capitalone.com]
> **on behalf of** USMAN MUSHTAQ <usman.mushtaq@capitalone.com> [usman.mushtaq@capitalone.com]
> **Sent:** 10/25/2018 4:14:43 PM
> **To:** Catherine Ardolina (CONT) [catherine.ardolina@capitalone.com]
> **Attachments:** image001.gif
>
> We just had a ceiling tile fell right next to an associate in the branch, apparently there is a water leak coming from the second floor all the tiles are wet. This is a huge concern because the associates use that door to go to the break room and the rest room.
> --

> **From:** Catherine Ardolina (CONT) [catherine.ardolina@capitalone.com]
> **on behalf of** Catherine Ardolina (CONT) <catherine.ardolina@capitalone.com> [catherine.ardolina@capitalone.com]
> **Sent:** 11/16/2018 2:05:21 PM
> **To:** jack@jtreholdings.com
> **CC:** Randy Levitt [Randy.Levitt@capitalone.com]; Danielle Gaudio [Danielle.Gaudio@capitalone.com]; Morris Terzi [mt@jtreholdings.com]
> **Subject:** Re: [External Sender] 807 Manhattan // JTRE
>
> Hi Jack,
>
> Thank you. Just wanted to let you know that I will be meeting onsite with my GC next Tuesday at 11 to go over some cosmetic work. I am going to have him look at the interior repairs that need to be made by the front window and safe deposit area as well the to the portion of the dome that is leaking. I will keep you posted, or you and/or Morris are welcome to meet with us.
>
> Thanks
>
> On Fri, Nov 16, 2018 at 12:57 PM Jack Terzi <jack@jtreholdings.com> wrote:
>> Danielle/Randy/Cathy,
>>
>> A pleasure to finally meet you in person last week. I'm glad we had the opportunity to understand everything that's been going on. We want you to know that there is an open door policy for us, and any time you have a question or something arises please call Morris or myself.
>>
>> I look forward to our continued relationship, and success of Capital One at 807 Manhattan Avenue.
>>
>> Jack Terzi
>
> --
> Catherine Ardolina-Fanelli, Facility Manager
> Brooklyn, North-Western Queens and Lower Manhattan
> Jones Lang LaSalle for Capital One Bank
> (631) 774-2624

24. In Statement No. 79, Defendant asserts that "In July 2019, Capital One reported a "flood" that entered the building's atrium through the roof and damaged Capital One's property." The email correspondence being referred to is between Slate and Capital One, not JTRE. In addition, the email itself establishes Slate's

8

assertion (Georgios Avramides was employed by Slate) that they found the source of the leak as being Slate's demolition.

> **From:** Georgios Avramides [gavramides@slatepg.com]
> **on behalf of** Georgios Avramides <gavramides@slatepg.com> [gavramides@slatepg.com]
> **Sent:** 7/12/2019 1:44:15 PM
> **To:** Catherine Ardolina (CONT) [catherine.ardolina@capitalone.com]
> **CC:** Jeffrey Yachmetz [jyachmetz@slatepg.com]; Danielle Gaudio [danielle.gaudio@capitalone.com]; Kellar, James [jkellar@mccarter.com]; Morris Terzi [mt@jtreholdings.com]; Randy Levitt [randy.levitt@capitalone.com]
> **Subject:** [External Sender] RE:
>
> Hi Cathy,
>
> Our team has identified what they believe to be the source of the leak as a small patch on the roof that was demoed yesterday. With yesterday's rain, there was some water penetration that likely made its way into the bank. The crew onsite is working right now to seal the opening with a coating that will plasticize; additionally, they'll be installing a temporary roof.
>
> We will handle the cleanup of the space; my understanding is they're waiting for the space to dry out before proceeding. Please feel free to text me further to coordinate.
>
> Thanks,
>
> Georgios Avramides
> Project Manager
> Slate Property Group
> 38 East 29th Street, 9th Floor | New York, NY 10016
> P 646.762.1421
> C 508.965.2261
> gavramides@slatepg.com | www.slatepg.com
>
> **From:** Catherine Ardolina (CONT) <catherine.ardolina@capitalone.com>
> **Sent:** Friday, July 12, 2019 09:55
> **To:** Georgios Avramides <gavramides@slatepg.com>
> **Cc:** Danielle Gaudio <danielle.gaudio@capitalone.com>; Kellar, James <jkellar@mccarter.com>; Morris Terzi <mt@jtreholdings.com>; Randy Levitt <randy.levitt@capitalone.com>
> **Subject:**
>
> Georgios, please provide a status update on the cause of the flood when you are able. We had damage to a printer and cash counter in addition to the ceiling tiles. Thanks
>
> --
>
> Catherine Ardolina-Fanelli, Facility Manager, Manhattan
> Jones Lang LaSalle for Capital One Bank
> (631) 774-2624

25. Defendant claims that "It is undisputed that "the roof in that dome area was crumbling all over the floor," and that "the water infiltration [] came though from the dome."" *(Statement No. 81).* There was never crumbling to the extent there was any danger or structural compromise. I had seen flakes and bits of plaster on the ground beneath the roof where Slate had been working but it is a far exaggeration to say the roof was "crumbling."

26. Randy Levitt did not have the same personal knowledge as I did at the time; I believe I was at

9

the site far more frequently than he was.  In his deposition (Page 173) he even testified as follows:

> Q.··How much water do you think was coming in?
> A.··I was not on site when it started coming in.
> I was there days after.··I think Morris and I met there, if I remember correctly.
> We had to divert the water so that we did not have any damage to our equipment.
>
> Q.··When was that?
> A.··I don't remember the date.
>
> Q.··Do you remember, like, a time when you had six inches of water in the premises because of the conditions that you complained of?
> A.··No.  It was too big.

and 147:

> Q.··Before 2022, do you remember when the last time was that you visited the premises?
> A.··I do not.
>
> Q.··Do you remember Capital One actually closing the branch?
> A.··Do I remember?
>
> Q.··Yes.
> A.··I was not personally there.

27.     He similarly has no personal knowledge with respect to the source of the water infiltration.  See, e.g. Page 172 of his deposition:

> Q.  Between 2017 and 2020, on the worst day, how much water was on the premises, how much debris fell from the peeling ceiling?
> A.  I wouldn't say it was a one-time thing.  It was incidents one after another of -- you know, when the plaster was falling, you know, it fell on somebody's head.
>
> Q.  How much of the plaster fell in the worst time you can remember; was it buckets and buckets or a few --
> A.  No, it wasn't buckets and buckets, but it was bad enough that it fell on somebody's head, and, you know, caused them to file,

28.     Defendant argues (Statement 83) that "The roof leaks "did not get fixed."" And (84) that "JTRE cannot identify any steps it undertook to repair the roof"  This is misquoted and simply incorrect.  I had stated broadly in my deposition that "things did not get fixed."  Capital One acknowledged several times that Slate was the responsible party and understood and acknowledges that JTRE had been making consistent efforts to have Slate make repairs. *See Responses 77, 80 and 107.*  See also where I testified that:

10

Q. And what do you recall about that complaint?
A. I recall that the Slate, the condo owner of -- that was building above us, was doing construction, which really -- which entailed -- was doing roof work which led to a leak in this space, in this space. And once we got the notice, we had our crew help facilitate Capital One and Slate to get that remediated.

29.     Indeed, I was doing everything I could to intervene on Capital One's behalf and get Slate to make the repairs Capital One had sought. The following is a true and accurate copy of emails I sent:

> From: Morris Terzi [mailto:mt@jtreholdings.com]
> Sent: Thursday, October 31, 2019 9:03 AM
> To: Georgios Avramides <gavramides@slatepg.com>; Jeff Yachmetz <jyachmetz@slatepg.com>
> Subject: 807 Manhattan Avenue - Leak
>
> Jeff / Georgios - Capital One has sent the below photos stating a leak in the space behind the ATM Machines. This is directly below the construction site, can you have someone onsite check this out immediately?
>
> Thank You,
>
> Morris Terzi

> From: Morris Terzi [mailto:mt@jtreholdings.com]
> Sent: Thursday, January 2, 2020 10:55 AM
> To: Georgios Avramides <gavramides@slatepg.com>; Robert Hartmann <rhartmann@vectorgroup.us>
> Cc: Randy Levitt <randy.levitt@capitalone.com>; john.lynott@capitalone.com
> Subject: 807 Manhattan Avenue - Leak
>
> The bank is reporting sporadic leaks.
> Georgios / Rob – Please have someone go over immediately and advise.
>
>
> Morris Terzi
>
> JTRE
> 362 Fifth Avenue
> New York NY 10001
>
> 212.295.8004
> mt@JTREholdings.com
> www.JTREholdings.com

30.     Thus, it is inaccurate to say that "JTRE admitted that the roof was not fixed and that there is no evidence showing that it was fixed" (85).

31.     I never agreed with Capital One's allegations with respect to the roof leaks as suggested by Defendant. I had explained in my deposition, and maintain here, that Slate, not JTRE was going to be offering

11

to pay Capital One:

> Q. And you looked to Slate, the adjacent condominium owner, and asked that they -- that they --
> A. Not adjacent. Our buildings aren't connected.
>
> Q. Okay. But you looked to Slate, who you saw was the cause of these problems, to fix them and reimburse Capital One, right?
> A. Correct.
>
> (Page 68)

and

> Q. Looking at this e-mail chain, would it be fair to say that Slate said they would pay Capital One, but they had some concerns about the backup invoices?
> A. Yes.
>
> (Page 69)

32. To be clear, JTRE was not the party doing the work. Slate was the party doing the said Condominium work, not JTRE. As part of the condominium conversion, Slate, as the residential owner, agreed to provide the commercial unit – the premises at issue – a new heating, ventilation and air conditioning ("HVAC") system. See also, Jack Terzi's Decl., ¶17 and Exhibit 2 (Condo Declaration) Article 2.5 and Schedule 2.5 annexed thereto. They further agreed to do so at their sole expense and with no adverse effect on Plaintiff or its tenant. Jack Terzi's Decl., ¶17 and Article 35.

33. On July 17, 2019 I was cc:ed on an email which is reproduced here and which I believe is a true copy of the email being quoted. Interestingly and instructive here is that this is an email between Capital One and Slate, not JTRE.

> From: Catherine Ardolina (CONT) [catherine.ardolina@capitalone.com]
> on behalf of Catherine Ardolina (CONT) <catherine.ardolina@capitalone.com> [catherine.ardolina@capitalone.com]
> Sent: 7/17/2019 10:21:46 AM
> To: Georgios Avramides [gavramides@slatepg.com]
> CC: Danielle Gaudio [danielle.gaudio@capitalone.com]; Jeffrey Yachmetz [jyachmetz@slatepg.com]; Kellar, James [jkellar@mccarter.com]; Morris Terzi [mt@jtreholdings.com]; Randy Levitt [randy.levitt@capitalone.com]
> Subject: Re: [External Sender] RE:
>
> Georgios, In addition, the branch just reported a loud rumbling in the area over the employee restroom. Its sounds like a jack hammer. There are vibrations and its difficult to hear. Please ask Rob to investigate this as well and we ask that this work be discontinued until after hours.

12

34.     In Statement No. 110, Defendant asserts that "On July 23, 2019, Capital One was forced to shut down the ATM machines because of the extensive water that leaked through the hole in the roof that the Calyer Building owner had caused during its earlier construction." Provided herewith as Exhibit 38 is a true and accurate copy of an email chain from Randy Levitt acknowledging that the ATM leak issue had been fully rectified.

35.     Defendant claims in its Rule 56.1 Statement that "It is undisputed that the amounts Capital One paid to Charel and Gregor were reasonable." (Statement No. 117). I believe this, too, is mischaracterized. I did not know or have an opinion. I believe, actually, that Capital One had been discussing the reasonableness of its expenditures with Slate, who had been questioning them. See, e.g., one of many emails discussing the reimbursement, which are true and accurate copies:

> From: Paul Woody <pwoody@slatepg.com>
> Sent: Wednesday, January 30, 2019 10:32 AM
> To: Morris Terzi <mt@jtreholdings.com>
> Cc: Jeffrey Yachmetz <jyachmetz@slatepg.com>; David Schwartz <david@slatepg.com>
> Subject: RE: [External Sender] 807 Manhattan Avenue - Capital One
>
> I called Danielle last night. I updated her on the status of the heating work and asked when we'd be getting Capital One / HVAC consultant's report- she said that was up to Randy and she couldn't speak to that.
>
> Regarding the reimbursement for the heating costs for this and the last heating season- I told her we were willing to pay them $100,000, stating that we still haven't gotten all required backup, but even if we had we think the full price was overblown. She said that because they had to invoke self help, they had no choice and the price is what it is. I told her they should've given us a heads up that they would be doing the work and billing us back… she claims she did, but I do not agree. In any case, she is bringing our $100,000 offer back to her group and will see what they say.
>
> Paul Woody
> SLATE Property Group

and, e.g. the following email exchange between counsel for Slate and JTRE later in 2019:

13

> On Oct 17, 2019, at 8:31 AM, Peter Dee <pdee@tuttleyick.com> wrote:
>
> Rose
>
> With respect to Capital One's claim for reimbursement for temporary heat, please find attached the following:
>
> - Proposal from TP for Gregor work
> - Proposal from TP for temporary heating
> - JTRE Cost Reimbursement Claim analysis sheet
>
> 807 Manhattan is of the position that Capital One is owed **$186,582.34** as opposed to $312,713.59 based on the backup that they've provided, and offers that amount to resolve the dispute.
>
> The biggest culprits for the discrepancy are the $73,600 Gregor proposal and the $118,612 sum of Gregor costs for 2017/2018. The proposal that Gregor provided appears to already be baked into the $118,612 and therefore double counted in the cost statement. Furthermore, the $118,612 doesn't actually represent the sum of backup provided for each of the items identified in that cost's description; the actual total comes to $75,608.
>
> The savings that TP's estimate represents in totality amounts to $129,020, given that the temporary heaters could have been purchased for $25,000 from the start and therefore eliminated all subsequent rental charges.
>
> We are happy to discuss further.
>
> Regards,
>
> Peter C. Dee
>
> **Tuttle Yick** LLP
>
> 220 East 42nd Street, 29th Floor
> New York, New York 10017
> t: 646.694.9637 | f: 646.606.2409
> pdee@tuttleyick.com | www.tuttleyick.com

and JTRE's counsel's response, which I received and testify is a true and accurate copy:

14

> From: Rose Greenberg <rgreenberg@lhrgb.com>
> Date: October 17, 2019 at 9:01:00 AM EDT
> To: Peter Dee <pdee@tuttleyick.com>
> Subject: Re: 807 Manhattan - Capital One reimbursement claim
>
> Pete - I already asked the Bank about the Gregor $73K proposal and provided a ledger demonstrating payment of both Gregor $118K and $73K amounts. Candidly it is frustrating that no one appears even to have studied the documentation and analysis previously provided. Furthermore, you provide no basis for your client's statement that equipment could have been purchased for $25K. Another conclusory and unsubstantiated assertion. Even if true, why would the bank have purchased rather than rented equipment for Winter #1 if it reasonably assumed 807 would fix the problems by Winter #2?
>
> Disappointing.
>
> I will be sending to you later today copies of emails among 807, Capital One and the previous owner of Unit 1 which conclusively demonstrate 807's actual knowledge of the need for heat to the Bank premises during Winter #1.
>
> All rights reserved.

36. Finally, in Statement 129, Defendant asserts that "JTRE admitted that "Capital One timely delivered the Early Termination Notice on or before the Notice Date," which I do not dispute. However, JTRE did sent a letter March 10, 2020 disputing the effect of the said letter and the purported termination. See Exhibit 39 provided herewith, which is a true and accurate copy.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:     New York, New York
           March 24, 2023

_____
Morris Terzi

Respectfully submitted by:

The Law Firm of Jeffrey S. Dweck, P.C.

_____
By: Jeffrey Dweck (JD 6658)

43 West 33rd Street, Suite 304
New York, New York 10001
(212) 967-0500
Attorneys for Plaintiff
JTRE Manhattan Avenue LLC and JTRE 807 Manhattan Avenue LLC