Jeffrey Dweck, Esq.
THE LAW FIRM OF JEFFREY S. DWECK, P.C.
43 West 33rd Street, Suite 304
New York, New York 10001
(212) 967-0500
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JTRE MANHATTAN AVENUE LLC and JTRE 807 MANHATTAN AVENUE LLC, <br><br> Plaintiff, <br><br> -against- <br><br> CAPITAL ONE, N.A., <br><br> Defendant. | **Case No. 21-CV-05714 (JLR)** |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Dated:   New York, New York
         March 24, 2023

THE LAW FIRM OF JEFFREY S. DWECK, P.C.
By:  Jeffrey Dweck (JD 6658)

43 West 33rd Street, Suite 304
New York, New York 10001
(212) 967-0500
Attorneys for Plaintiff
JTRE Manhattan Avenue LLC and JTRE 807 Manhattan Avenue LLC

## PRELIMINARY STATEMENT

In this simple action for breach of a lease agreement and for money damages arising therefrom, Defendant Capital One has resorted to nothing more than distractions. Distractions with respect to premises conditions, heat and alleged leaks, all of which provide a compelling narrative, except that <u>none</u> are Landlord's responsibility and <u>all</u> are covered by explicit provisions of the Lease holding the Landlord harmless.

Moreover, Capital One presumably knew of most if not all of the issues it complained of before Plaintiffs ever took ownership of the property and became their landlord.

The only logical conclusion is that for one reason or another[1] – not known to the Defendant's only witness (in this motion) thus far[2] – Capital One wanted out of their Lease early and used ongoing construction being done by a third party as its "out," knowing full well that per the subject Lease, the Landlord was not responsible for the conditions that Capital One had been complaining of.

Capital One's opposition to Plaintiffs' motion is substantively devoid of merit. Capital One's opposition does not meaningfully respond to Plaintiffs' points. Instead, Capital One engages in a rote recitation of the alleged conditions at the subject premises and disregards that throughout Plaintiffs continued to do what they had been doing throughout – enlisting Slate's cooperation to take responsibility for the construction it had been doing. Capital Ones pursues this argument knowing full well that the Lease provisions specifically provide that the Landlord is not responsible for heat or HVAC and not responsible for conditions caused by Slate. Capital One never mentions in its papers that it knew full well that condominium-related construction was ongoing before LTRE ever entered the scene and never concedes the plain meaning of Section 34.1 of the Lease – that Capital One knew exactly what was happening,

---

[1] Perhaps the impending pandemic or some other economic or business reason. Just by way of example, in Capital One's 2020 Annual Report, they state that "In late February 2020, markets plummeted in the U.S. and across much of the world due to fear and uncertainty surrounding the pandemic." https://investor.capitalone.com/static-files/1364d634-a3d5-464d-8505-ddf46eda928d

[2] Randy Levitt is the only Capital One personnel whose testimony has been offered. The extent to which he knew (or did not know) the bank's true motivation for closing up is summarized in his deposition At his Deposition, Pages 147-152).

actually participated in its genesis (Defendant's Rule 56.1 Statement, ¶¶ 7-11), and signed up for it. Long before JTRE entered the scene Capital One cashed out in 2015 to a condominium developer (presumably for a profit) knowing the conditions would be challenging, as described in Section 34.1.

Turning back to Slate as the responsible party, in its very January 8, 2020 Notice, Capital One acknowledged that "Moreover, it is obvious but should be reiterated that all of these problems stem from disruptions and faulty work related to Slate's construction on the property."

If all that is not compelling, a mere month before the February 2020 alleged termination notice, Randy Levitt himself acknowledged in January 2020 that "<u>all is corrected/no issue</u>."[3] Capital One was not unable to occupy the premises or conduct business and JTRE' was not in breach.

In sum, we ask this Court to see past the alleged heat and leak issues to the plain language of the Lease itself, and grant Plaintiffs' motion for summary judgment and deny Capital One's cross motion in its entirety.

**ARGUMENT**

I. **JTRE did not breach Section 8.3, 10.4 or 12.2(a) of the Lease By Failing to Provide Adequate Heat.**

Capital One relies on the requirement that the Landlord operate the building "in accordance with the Comparable Building Standard" to support its contention that a minimum heat temperature was required and that Landlord was responsible to provide it. "Comparable Building Standard" is a very specifically defined term and deals only with the general operation of the building "in a manner consistent with the practices of a majority of owners of comparable commercial buildings in the general geographic area of the Property," making no specific reference to heat, which is expressly dealt with elsewhere in the Lease, and which explicitly and unambiguously falls solely on the Tenant. The "Comparable Building Standard" is <u>not</u> a guaranty of minimum temperature. And to the extent the Defendant seeks to stretch the said provision, it has raised a triable issue of material fact, i.e., what exactly do other commercial owners in

---

[3] emphasis added

3

the neighborhood do. Thus, there is no breach of Section 8.3 and to the extent it even applies, there is certainly no grounds for summary judgment on the issue.

Capital One invokes the NYC Building Code which is equally inapplicable in this case. Where the tenant expressly waives a provision of code such as this and accepts full responsibility for maintenance of the HVAC, the Code does not apply. Even if the Code does apply, the Code is a building code, not a tenancy rule. In other words, it deals with heating capacity, not the provision of heat, and is therefore woefully out of context in this case. The Code says "Interior spaces intended for human occupancy shall be provided with active or passive space-heating systems capable of maintaining a minimum indoor temperature as indicated in Table 1204.1 at a point 3 feet (914 mm) above the finished floor. The heating capacity of heat-producing devices and equipment which are contained in the room and in constant use during occupancy may be deducted from the capacity of the heating system." There is no evidence that, under proper repair, the systems in place did not have the requisite capacity. Even if this Court were to find that the Code applies, whether the capability (to use a term from the Code) existed is an issue of material fact. Third, the Appellate Division of the New York State Supreme Court, First Department, in the case of Koch v. Fox, 71 A.D. 288, 75 N.Y.S. 913 (1st Dep't 1902), observed that ordinances such as local building codes might impose a penalty but did not create a private cause of action. Finally, neither the Building Code nor the Comparable Building Standard was never mentioned in a Default Notice, making this argument too late.

Capital One refers to various "admissions" allegedly made throughout discovery none of which are quotes in context. See Plaintiffs' Response to Defendant's Rule 56.1 Statement.

Capital One then turns to Section 10.4 of the Lease, also relied upon by the Plaintiffs in support of their motion. Section 10.4 requires Plaintiffs to use "commercially reasonable efforts to cause the Owner and/or the Condo Board, as applicable, to maintain the Calyer Building in accordance with the Comparable Building Standard, provided, however, that Landlord shall not be liable for any failure on the part of the Owner and/or the Condominium Board."

Capital One finally turns to Section 12.2(a) of the Lease which indicates the same "commercially reasonable efforts" and the same proviso that the "Landlord shall not be liable for any failure on the part of the Owner and/or the Condominium Board."

In either case, no issue has been made that commercially reasonable efforts were not undertaken and, if anything, the record is clear that JTRE did what it could.  In any event, were Capital One to now raise this issue, JTRE's commercially reasonable efforts would be a clear issue of material fact.

**II.   JTRE did not breach Section 8.3, 10.4 or 12.2(a) of the Lease by Failing to Repair Roof Leaks.**

While Capital One is correct in quoting the Lease for Landlord's ordinary roof maintenance responsibilities, it ignores the superseding provisions of 10.4 (and other parts of the Lease, discussed below) which provides that: that the Landlord "shall not be liable for any failure on the part of the owner and Condo Board."  Under Section 12.2 (Landlord's Obligations), the Lease makes clear that while the Landlord does have obligations to repair structural problems, "however, Landlord shall not be responsible for any fault of Owner or the Condo Board."  Again, Section 12.3 of the Lease precludes any suit for damages against the Landlord where utilities or services are interrupted or terminated because of repairs, installations, improvements or any cause beyond Landlord's reasonable control. The Lease makes clear that any such interruption or termination <u>does not</u> relieve the Tenant from performance of any of its obligations thereunder, including the obligation to pay rent.  Finally, Section 34.1 further provides that "Tenant acknowledges that Landlord intends to convert the Property to a Condominium form of ownership …. Tenant acknowledges that to complete the Condominium conversion, the Building may undergo construction, alterations, additions or improvements which may consist of demolition or cause excessive nose, vibrations, dust, debris and the eviction of scaffolding or other protective measures …." … "Landlord agrees to use commercially reasonable efforts to minimize interference with the conduct of Tenant's business. …"

Again, as stated in the Rule 56.1 Response and the Declaration of Morris Terzi, JTRE never agreed or acquiesced to any failure on JTRE's part to comply with the Lease.

5

### III. JTRE did not breach Section 29 or 34.1 of the Lease by Allowing Disruptive Construction.

Whether or not JTRE "allowed" any disruption by Slate is an issue of fact. In any event, under the express terms of Section 34.1 Tenant acknowledges the construction but now takes issue with the alleged noise and disruption. Under the said Section the Tenant acknowledged "construction, alterations, … demolition … excessive noise, vibrations, dust, debris…" For starters, "Landlord" here refers to the party doing the Condominium Conversion, which was Slate, who was the "Landlord" before the Lease was assigned, and who had begun the Condominium Conversion prior to the assignment to JTRE and thus are the parties responsible under this provision. For the purposes of this provision, and Capital One knew this full well, Slate was the party engaged in the construction, not JTRE. Even were the Court to obligation JTRTE under this provision, JTRE's obligations are limited to using commercially reasonable efforts to get Slate to work after hour <u>is and only if</u> the construction was making it impossible for Capital One to occupy the premises during business hours.

Whether Capital One could operate or whether the work "materially adversely affect[ed] the conduct of Tenant's business in the Premises such that Tenant can no longer reasonably operate its business within the Premises pursuant to the Lease" is squarely an issue of fact which has not been established by the Defendant as a matter of law, as is whether or not Slate actually started working after business hours. I any event, the Lease provides that "Landlord [meaning Slate] shall be entitled to perform all other work during normal business hours, without the obligation to incur overtime or additional expense."

### IV. Capital One's November 2, 2018, February 26, 2019, July 17, 2019 and July 23, 2019 Closures Are Irrelevant.

That Capital One had to close three times over the course of Slate's construction and its ATMs once is regrettable and unfortunate. It is not, however, grounds for a Lease termination in February 2020, a month after Randy Levitt himself acknowledged in January 2020 that "<u>all is corrected/no issue</u>."[4] If

---

[4] emphasis added

anything, these infrequent and sporadic occurrences – all cured by February 2020 (evidenced by the lack of <u>any</u> closures after July 2019) render these closures irrelevant to the mater at hand.

In any event, Randy Levitt himself acknowledged in January 2020 that "<u>all is corrected/no issue</u>."[5] Capital One was <u>not</u> at that time unable to occupy the premises or do conduct its business.

### V. JTRE Had No Obligation to Reimburse Capital One.

As stated in the Declarations of Jack Terzi and Morris Terzi, JTRE had been acting as a middleman only agreeing on only one occasion to reimburse Capital One if Slate wouldn't. In other words, as a courtesy, and not because they were required under the Lease.  Capital One acknowledges Slate's obligation and engaged with Slate as Slate questioned the reasonableness of the expenditures.  These were not JTRE responsibilities or Lease obligations.

### VI. In Response to Capital One's Alleged Valid Termination Notice and Attempt to "Fall Back" on an October 31, 2021 Termination Date, JTRE relies on its original Memorandum of Law.

JTRE refers to its original Memorandum in response to Capital One's conclusory allegations that its notices were valid even though they were not sent to the "Notices" party set forth in the Lease and in response to Capital One's purported attempt to provide a "fallback" notice terminating the Lease under Section 3.2 of the Lease which was also addressed therein.

The plain reading of counsel's and the supporting testimony of Jack Terzi in his Declaration (¶ 125 and Exhibit 30 thereto) make clear that Rivkin Radler was not a formal "Notices" party.  On January 15, 2020, Rivkin Radler did send Defendant's counsel McCarter & English a response to Capital One's January 8, 2020 notice.  In that correspondence, Rivkin Radler stated: "Our office is counsel for JTRE with respect to the [Lease] and, as such, all future correspondence relating to this matter should be directed to our office."  The purpose of this provision was to have all dispute-related correspondence directed to new counsel and not to our former attorneys.  This <u>was not</u> intended to modify the Lease notice provision not did it.

---

[5] emphasis added

After JTRE assumed the Lease from Prior Landlord, Capital One was served with a "Tenant Notice Letter," dated May 29, 2018 (the "Notice Letter"), which specifically advised Capital One, among other things, "to address any and all _notices_ … to the landlord under or in connection with your lease to" JTRE at: c/o JTRE Holdings, LLC, 362 Fifth Avenue, 12th Floor, New York, New York 10001.  Jack Terzi Decl. ¶ 121.

**VII.   In Response to Capital One's Final Arguments -- Discounting the Tenant Estoppel and Addressing Removal of the Vaults -- JTRE relies on its original Memorandum of Law.**

### CONCLUSION

For the reasons stated above, Plaintiff respectfully asks that this Court grant Plaintiff's motion for summary judgment on its breach of contract claim and grant summary judgment dismissing Plaintiffs' counterclaim, and this this Court accordingly deny Defendant's motion for summary judgment in its entirety.

Dated:       New York, New York
             March 24, 2023

THE LAW FIRM OF JEFFREY S. DWECK, P.C.
By:  Jeffrey Dweck (JD 6658)

43 West 33rd Street, Suite 304
New York, New York 10001
(212) 967-0500
Attorneys for Plaintiff
JTRE Manhattan Avenue LLC and JTRE 807 Manhattan Avenue LLC