UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JTRE MANHATTAN AVENUE LLC and
JTRE 807 MANHATTAN AVENUE LLC,

                              Plaintiffs,

                -against-

CAPITAL ONE, N.A.,

                              Defendant.

Case No. 1:21-cv-05714 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

In 2015, Capital One, N.A. ("Capital One") rented a bank building that suffered from several issues, including leaks in the roof and inadequate heating. Capital One and the building's owner, JTRE 807 Manhattan Avenue LLC f/k/a JTRE 241 Fifth LLC and JTRE Manhattan Avenue LLC (together, "JTRE"), now dispute who was responsible for the building's problems under the terms of the lease. Dkt. 109.

The parties have filed cross-motions for summary judgment on the breach-of-contract claims still at issue.[1] *See* Dkts. 121 ("Pl. Br."), 123 ("Df. Br."), 133 ("Pl. Reply"), 134 ("Df. Reply"). JTRE claims that Capital One breached by failing to pay rent. *See generally* Dkt. 26 (the "Second Amended Complaint" or "SAC"). Capital One claims that JTRE breached by failing to reimburse costs to remediate problems that were allegedly JTRE's responsibility. *See*

---

[1] In support of its motion, JTRE submitted a Local Civil Rule 56.1 statement of facts (Dkt. 120) and a declaration, with attached exhibits, from Jack Terzi (Dkt. 119). In opposition to Capital One's summary-judgment motion, JTRE also submitted an additional declaration from Morris Terzi with attached exhibits (Dkt. 132) and a response to JTRE's Rule 56.1 statement (Dkt. 131).

In support of its motion, Capital One submitted a Rule 56.1 statement (Dkt. 124) and declarations, with attached exhibits, from Brooks H. Spears (Dkt. 125), Sheila E. Calello (Dkt. 126), and Randy Levitt (Dkt. 127). In opposition to JTRE's motion, Capital One also submitted a response to JTRE's Rule 56.1 statement (Dkt. 128).

*generally* Dkt. 52 ("Ans.").  Capital One has also moved to preclude the report and testimony of JTRE's expert witness.  Dkt. 114 ("Daubert Br.").

For the following reasons, the Court denies JTRE's summary-judgment motion, grants Capital One's partial-summary-judgment motion, and grants Capital One's motion to preclude JTRE's expert report and testimony.

## BACKGROUND

### I. Facts

Except where noted, the following facts are undisputed.

### A. The Property

In 2009, Capital One acquired title to the real estate located at 807 Manhattan Avenue in Brooklyn, New York (the "Property").  *See* Dkt. 125-2 at 5.  The Property consists of two connected units: the "Manhattan Avenue Building," bounded by Manhattan Avenue to the east and Calyer Street to the north, and the "Calyer Building," bounded by Lorimer Street to the west and Calyer Street to the north.  Dkt. 131 ("Pl. RSOF") ¶ 2.  From 2009 to 2020, Capital One operated a retail-banking branch in the Manhattan Avenue Building (the "Bank Building").  *Id.* ¶ 3.

When Capital One acquired the Property in 2009, two vaults with security deposit boxes were already built into the Bank Building.  *Id.* ¶ 5.  Capital One did not install any vaults or security boxes there during its tenancy.  *Id.* ¶ 6.

In October 2015, Capital One sold the Property to 807 Manhattan Avenue Holding LLC ("807 Holdings").  *Id.* ¶ 7.  As part of the 2015 sale of the Property, Capital One and 807 Holdings entered into an Inline Branch Lease for the Bank Building, with Capital One as the sole tenant and 807 Holdings as the landlord.  *Id.* ¶ 8; *see* Dkt. 127-3 (the "Lease").  Also in October

2015, 807 Holdings leased the Calyer Building to 807 Manhattan Avenue LLC c/o Slate Property Group ("Slate").  Pl. RSOF ¶ 9; *see* Dkt. 125-4.

**B.  The Lease**

*1.  Overview*

In a "Key Provisions Summary," the Lease designates 807 Holdings as the Landlord and Capital One as the Tenant.  Lease at 1.  The Lease commenced on October 30, 2015, the day it was executed.  *Id.* at 1, 43, § 3.1.  The "Lease Term" is for twenty years, with the "Expiration Date" defined as the "last day of the calendar month in which the twentieth (20th) anniversary of the day immediately preceding the [Lease] Commencement Date occurs."  *Id.* at 1.

Section 3.2 of the Lease details the "Tenant Termination Right," granting Capital One "the right to terminate this Lease effective as of the expiration of the sixth (6th) lease year of the Lease Term (the 'Early Termination Date'), provided that Tenant delivers to Landlord written notice . . . of such election not less than twelve (12) months prior to the Early Termination Date."  *Id.* § 3.2 (emphasis omitted).  In the case of timely notice, "this Lease shall terminate as of the Early Termination Date (as if the Early Termination Date was the Expiration Date under the Lease), and neither party shall have any further obligation, other than those obligations which expressly survive the expiration of this Lease."  *Id.*

Under Section 26, titled "Estoppel Certificate," "Landlord and Tenant agree that they will from time to time upon request from each other . . . execute and deliver to such persons as the requesting party shall request, a statement certifying that this Lease is unmodified and in full force and effect . . . , stating that Landlord or Tenant, as applicable, is not in default hereunder to the best of such party's knowledge."  *Id.* § 26 (emphasis omitted).

The Lease also contains New York choice-of-law and choice-of-forum clauses.  *See id.* § 33.8.

## 2. *Landlord Obligations*

The Landlord's obligations are detailed in various provisions of the Lease.  Section 8.3 discusses the Landlord's covenant "that it will operate and maintain the Manhattan Avenue Building in accordance with the Comparable Building Standard," *id.* § 8.3, defined elsewhere as the "manner consistent with the practices of a majority of owners of comparable commercial buildings in the general geographic area of the Premises, as the term is understood in the general geographic area of the Property," *id.* § 10.4.

Section 10.2 states that "Landlord shall, at its expense without reimbursement or contribution by Tenant . . . keep, maintain, and replace, if necessary, . . . structural systems, including without limitation, the roof, roof membrane, roof covering (including interior ceiling, inventory and other personal property if damaged by leakage emanating from the portion of the Manhattan Avenue Building outside of the Premises or from the Calyer Building leaking into the ATM space), load bearing walls, floors, slabs, and masonry walls in good condition and repair, normal wear and tear excepted."  *Id.* § 10.2.  If the Landlord fails to "keep and preserve the Premises" as set forth under this section, the Lease outlines a process by which the Tenant may notify the Landlord of its failure, perform the required repair itself, seek reimbursement from the Landlord, and, if the Landlord does not reimburse the Tenant, offset the amounts due from the Tenant's rent payments.  *Id.* § 10.3.

 Section 10.4 discusses the Landlord's maintenance of all building systems and structural portions.  It provides that "Landlord shall maintain, or cause to be maintained, the Manhattan Avenue Building in a safe, clean and sanitary manner, with all building systems and structural portions of the Manhattan Avenue Building in good working order and repair throughout the Term, and otherwise [in line with the Comparable Building Standard]."  *Id.* § 10.4.  "Following the transfer of ownership of the Calyer Building, Landlord shall use commercially reasonable

efforts to cause the owner and/or Condominium Board, as applicable, to maintain the Calyer Building in accordance with the Comparable Building Standard; provided, however, Landlord shall not be liable for any failure on the part of the owner and/or Condominium Board." *Id.*; *accord id.* § 12.2(a).  As with Section 10.3, Section 10.4 details a process by which the Tenant may perform the required repair itself and seek reimbursement from the Landlord.  *Id.* § 10.4.

Section 12.2 discusses the Landlord's maintenance and operation of the Bank Building. It states that "Landlord shall at all times operate and maintain the Manhattan Avenue Building in accordance with the Comparable Building Standard.  Upon Tenant's request, Landlord shall use commercially reasonable efforts to cause the owner and/or Condominium Board, as applicable to operate and maintain the Calyer Building in accordance with the Comparable Building Standard, provided, however, Landlord shall not be liable for any failure on the part of the owner and/or Condominium Board." *Id.* § 12.2(a).

In Section 29, "Landlord covenants that, provided that Tenant is not in default . . . , Tenant shall peaceably and quietly have, hold and enjoy the Premises subject to the provisions and agreements hereof without interference by any persons lawfully claiming by or through Landlord." *Id.* § 29.

However, in Section 34, "Tenant acknowledges that Landlord intends [to] convert the Property to a condominium form of ownership . . . [and] that to complete the Condominium Conversion, the [Property] may undergo construction, alterations, additions or improvements which may consist of demolition or cause excessive noise, vibrations, dust, debris, and the erection of scaffolding or other protective measures." *Id.* § 34.1.  "Landlord agrees that, during the Condominium Conversion and while making any such repairs, alterations, additions or improvements, Landlord shall use commercially reasonable efforts to minimize interference with

the conduct of Tenant's business.  Landlord agrees that any work that would materially adversely affect the conduct of Tenant's business in the Premises such that Tenant can no longer reasonably operate its business within the Premises pursuant to this Lease shall be performed after normal business hours . . . .  Tenant shall use good faith efforts to cooperate with Landlord during the Condominium Conversion." *Id.*

### 3. *Tenant Obligations*

The Lease also states Capital One's obligations as the Bank Building's tenant. Relevantly here, Section 5 requires Capital One to pay the "Minimum Monthly Rent" on the first day of each calendar month, as well as a prorated share of real estate taxes and certain maintenance and insurance costs incurred in connection with the Bank Building.  *See id.* §§ 5.1 to -.2, 11.1 to -.2.

Section 10.1 states Capital One's maintenance and repair obligations, including the duty to "maintain the heating, ventilating, and air-conditioning system (including, without limitation, the maintenance and replacement of the boiler unit) which exclusively services the Premises ('HVAC'), whether located within or outside of the Premises, pursuant to a maintenance contract." *Id.* § 10.1.

Section 14 states that, "upon the expiration or earlier termination of this Lease, Tenant shall remove its trade fixtures, security deposit box assemblies, ATMs, signs, and all other personal and/or proprietary property . . . , and shall repair any damage to the Premises or the Building caused by Tenant's removal of the same." *Id.* § 14.  "At the expiration of the Lease Term, the Improvements (and any of Tenant's Trade Fixtures as Tenant fails to remove), without the payment of compensation or consideration of any kind to Tenant, shall become Landlord's sole property, free and clear of any and all claims of Tenant." *Id.*

4. *Default and Remedies*

Section 20 of the Lease lists the circumstances that "shall constitute a default of this Lease by Tenant," including "the failure by Tenant to make any payment of Rent under this Lease, as and when due, where such failure continues for more than ten (10) days after Tenant's receipt of written notice of non-payment from Landlord." *Id.* § 20.1.  In the case of such a default, Landlord may, among other things, "terminate this Lease, whereupon Tenant shall quit and surrender the Premises, . . . and collect liquidated damages from the Tenant in an amount equal to (i) the sum of all amounts due hereunder to the date of termination, plus (ii) the aggregate Rent remaining over the unexpired portion of the Lease Term, plus the reasonable cost to Landlord for any repairs and other costs of re-letting (such as broker's commissions and the cost of advertising), all reduced to present value . . . , less (iii) the aggregate fair net rental value of the Premises over the remaining portion or the Lease Term . . . reduced to present value, plus (iv) Landlord's costs and expenses incurred in the enforcement hereof including reasonable attorneys' fees actually incurred as herein provided." *Id.* § 20.2.

Section 21 specifies when the Landlord's "failure to perform" amounts to a default of the Lease.  *Id.* § 21.1 (capitalization and emphasis omitted).  In particular, "Landlord shall not be in default unless Landlord fails to perform or observe any of its obligations under this Lease after a reasonable period of time, but in no event later than thirty (30) days after Landlord's receipt of written notice from Tenant [or within 90 days of notice if cure requires more than 30 days and Landlord diligently pursues such cure]."  *Id.*  This section sets requirements for the Tenant to notify the Landlord of its default:

> The written notice from Tenant shall give in reasonable detail the nature and extent of the failure and identify the Lease provisions containing the obligations.  If Landlord commits a Landlord's Default, Tenant . . . may . . . cure the Landlord's Default.  Landlord shall pay Tenant, upon demand, all costs, expenses, and

> disbursements incurred by Tenant to cure the Landlord's Default, including costs and reasonable attorneys' fees.  If such payment is not rendered within thirty (30) days of demand, Tenant may deduct all such costs and expenses from the Rent next coming due.  If Tenant elects not to cure the Landlord's Default, Tenant shall have the right to . . . terminate this Lease upon written notice to Landlord after the expiration of any such applicable cure period.

*Id.*

Section 31 outlines how notices as to the Lease must be delivered.  As relevant here, "[e]ach party giving a Notice shall address the Notice to the appropriate person at the receiving party (the 'Addressee') at the addresses listed in the Notice Addresses section of the Key Provisions Summary or to another Addressee or at another address as designated by a party in a Notice."  *Id.* § 31.2.  If the party giving the notice has not complied with this requirement, among others, the notice is not effective.  *Id.* § 31.3.

### C.  807 Holdings Cures Lease Default in April 2018

On June 23, 2017, 807 Holdings and Slate filed a declaration establishing the Property as two condominium units within the "807 Manhattan Avenue Condominium."  Pl. RSOF ¶ 10; *see* Dkt. 125-5 (the "Condo Declaration").  In November 2017, Slate acquired title to the Calyer Building from 807 Holdings, and the parties terminated their lease.  Pl. RSOF ¶ 11; *see* Dkts. 125-6 to -7.

On April 13, 2018, Capital One sent 807 Holdings a notice of default, referring to "work, including deafening drilling," taking place during Capital One's business hours.  Pl. RSOF ¶ 12; *see* Dkt. 127-4.  JTRE, a later purchaser of the Bank Building as described below, had actual knowledge of this notice.  Pl. RSOF ¶ 13.  Five days later, Capital One sent 807 Holdings a notice of cure.  *Id.* ¶ 14; *see* Dkt. 127-5.

### D.   JTRE Acquires the Property

In 2018, JTRE became interested in purchasing the Bank Building.  Df. RSOF ¶ 24.  To that end, JTRE asked 807 Holdings to obtain an estoppel certificate from Capital One to determine whether Capital One knew of any defaults under the lease or had any material complaints about the Bank Building.  *Id.*  807 Holdings asked Capital One to execute an estoppel certificate, which Capital One did on May 7, 2018.  Pl. RSOF ¶¶ 16-17; *see* Dkt. 127-7 (the "Estoppel Certificate").

Addressed to JTRE 241 Fifth LLC c/o JTRE Holdings LLC, the Estoppel Certificate states that Capital One "certifies to, and agrees with, JTRE 241 Fifth LLC, the prospective purchaser . . . of the . . . Premises, as of [May 7, 2018]" that "[n]either Tenant, nor to Tenant's knowledge, Landlord, is in default under any of the terms and conditions of the Lease."  Estoppel Certificate at 2.  Capital One issued the Estoppel Certificate "knowing that Purchaser, its lender and their respective successors and assigns are relying upon the representation herein made."  *Id.* at 3.

On May 29, 2018, 807 Holdings sold the Bank Building to JTRE, which became Capital One's new landlord and assumed 807 Holdings's obligations under the Lease.  Pl. RSOF ¶ 18; *see* Df. RSOF ¶ 22.  That same day, 807 Holdings sent a Tenant Notice Letter to Capital One, stating that:

> [Y]ou are hereby authorized and directed to make all future payments under the lease to [JTRE] and to address any and all notices and other communications to the landlord under or in connection with your lease to [JTRE] or [JTRE's] property manager at such address as may be designated by [JTRE].

Dkt. 127-8 at 2 (the "Notice Letter"); *see* Df. RSOF ¶ 28.

### E.  Issues with the Manhattan Avenue Building

The parties agree that the Bank Building "suffered from a number of issues, including but not limited to leaks in the domed roof and inadequate heating."  Dkt. 109.  However, they dispute the precise nature of those issues and when they occurred.

The parties agree that "[d]uring the cold seasons of 2018-2019 and 2019-2020, the temperature inside the Manhattan Avenue Building . . . dropped below [68 degrees Fahrenheit]."  Pl. RSOF ¶ 47; *see id.* ¶ 54 (agreeing that "at times the temperatures [in the Bank Building] were substandard"); Dkt. 125-17 ("M. Terzi Dep.") at 48:12-15 (agreeing that "it was reasonable and necessary for Capital One to obtain" temporary heating at some points); *id.* at 88:5-9 (agreeing that, as of January 27, 2019, the "HVAC systems were not functioning properly to provide" enough heat to the premises); Dkt. 127-16 (JTRE corporate representative reporting temperature of 63 degrees in the Bank Building on March 6, 2019).  The parties also agree that the roof of the Bank Building leaked at some points during Capital One's tenancy.  Pl RSOF ¶ 75.

Between November 2018 and February 2020, Capital One was forced to close its branch in the Bank Building either entirely or partly on at least four occasions because of issues related to construction by the owner of the Calyer Building.  *Id.* ¶ 99.  On November 2, 2018, the branch closed "due [to] a strong odor throughout the branch stemming from [the] work being done on the roof."  *Id.* ¶ 100 (quoting Dkt. 127-25 at 5).  On February 26, 2019, the facility manager issued an emergency alert for an "[u]nknown odor throughout the branch" that "smells of either gas or lead."  *Id.* ¶ 103 (quoting Dkt. 127-26).  The odor was "caused by Slate's construction" and required the branch to close.  *Id.* (quoting Dkt. 127-27).  On July 18, 2019, a significant amount of rain entered the building through a hole in the roof, which prevented the branch from opening.  *Id.* ¶ 107.  The hole was created when the owner of the Calyer Building "demoed" the roof a few days earlier.  *Id.*  On July 23, 2019, Capital One was forced to shut down the ATM

machines because of the water that leaked through the hole in the roof that the Calyer Building owner created during its earlier construction.  *Id.* ¶ 110.

In March 2019, Capital One paid Charel Contracting & Maintenance Company, Inc. ("Charel") $9,526.56 to repair a portion of the leaking roof.  *Id.* ¶ 113; Dkt. 127-31.  Capital One also paid Gregor Industries, Inc. ("Gregor") $91,770 for temporary heat during the cold season of 2018-2019, and another $28,000 for temporary heat during the cold season of 2019-2020.  Pl. RSOF ¶ 115; Dkts. 127-32 to -33.

In July 2019 and February 2020, Capital One sent JTRE's counsel written demands for reimbursement for the amounts paid to Charel and Gregor.  Pl. RSOF ¶ 118.  JTRE has not reimbursed Capital One for these payments.  *Id.* ¶¶ 114, 116, 121.

### F.  Capital One Complains of Building Issues

Between October 2018 and February 2020, Capital One sent at least six letters notifying JTRE of its purported failure to meet its contractual obligations under the Lease.

On October 19, 2018, Capital One sent JTRE a "formal notice" of JTRE's failure to address several issues: "(i) lack of proper heating and air-conditioning system; (ii) roof leakage emanating from . . . the dome [roof]; (iii) interior roof repair; (iv) consistent and recurring notices . . . from Con Ed concerning the cessation of electric service due to unpaid electric bills; (v) lack of running hot water in the lavatory facilities."  Dkt. 127-9 ("Oct. 2018 Not.") at 2; *see* Pl. RSOF ¶ 55.  This letter also stated that "Landlord's failure, in the past, to maintain the [Bank Building] in good working order and repair has forced Tenant to undertake the repair of the [Bank Building] on its own" and that Capital One had incurred $207,417.03 in repair costs for which it sought reimbursement from JTRE.  Oct. 2018 Not. at 3.  JTRE's then-counsel responded that JTRE "immediately undertook an investigation to the complaints" and noted that Slate, "the party performing the ongoing construction in the [Property] which appears to be the

source of most, if not all, of the disruptions to Capital One's operations over the course of the last year." Dkt. 127-10 at 2. The response also stated that follow-up questions should be "addressed to the undersigned." *Id.* at 3; *see* Pl. RSOF ¶ 56. JTRE's owners, Morris and Jack Terzi, agreed in depositions that the complaints in Capital One's October 2018 letter were accurate, at least in terms of describing the Bank Building's problems. M. Terzi Dep. at 51:5-52:23; *cf.* Dkt. 125-18 ("J. Terzi Dep.") at 28:22-29:4 (no reason to disagree with Capital One's contention of leaking roof and lack of proper HVAC system).

Capital One sent another "Notice of Default" on December 20, 2018. *See* Dkt. 126-6 ("Dec. 2018 Not.") (emphasis and further capitalization omitted). The letter described "little to no air conditioning in the summer," "little to no heat in the winter," leaking from the roof into the Bank Building, "an airborne hazardous substance . . . sickening employees [and] causing a shut-down of the branch," "no hot water in the lavatories," and "work being done at the Property during business hours" that is "noisy, disruptive and dirty." *Id.* at 2. Capital One warned that if JTRE did not remediate (or attempt to remediate) these issues, ensure that Slate's construction work did not disrupt Capital One's business, and reimburse Capital One for its related expenses, Capital One would begin to abate its rent in February 2019. *See id.* at 3. Morris Terzi acknowledged during his deposition Capital One's "complaints and concerns" as identified in its December 2018 letter. *See* M. Terzi Dep. at 67:18-68:1.

Capital One sent its next "Notice of Default" on July 19, 2019. Dkt. 126-8 ("July 2019 Not.") (emphasis and further capitalization omitted). The letter stated that the building issues identified in Capital One's previous notices, including those from October and December 2018, "have continued" and that Capital One "has continued to incur costs to provide proper heating and to otherwise remedy the Property Issues." *Id.* at 3. The letter reported that, in February

2019, the Bank Building suffered interrupted water service, "roof leaks and falling debris from the ceiling," and "a burning smell" that forced the bank to close the branch. *Id.* The letter added that, earlier in July 2019, Capital One had reported to JTRE "leaks at various locations" throughout the building that "resulted in broken and stained ceiling tiles and damage to a printer, cash counter, and other furniture." *Id.* at 4. The letter cited reports from Capital One employees on July 17, 2019, of "loud rumblings and vibrations that make it difficult for them to hear and for the branch to operate," and stated that Capital One was unable to open its branch on July 18, 2019, when, "after a night of heavy rain, significant amounts of water again leaked into the [Bank Building]." *Id.* at 5. Morris Terzi subsequently acknowledged that the leaks identified in the July 2019 letter were "an ongoing problem" that "kept on happening." M. Terzi Dep. at 96:23-25; *see id.* at 98:8-12 (confirming that the roof was still leaking in July 2019).

In an email sent on December 12, 2019, Capital One informed JTRE's counsel that "the temperature in the ATM room has dropped to 57 degrees, which is unacceptable." Dkt. 126-10. In a letter response, JTRE acknowledged the "heating issues that Capital One is currently facing" and attributed them to the "deficient and insufficient work performed by [Slate] in its capacity as the owner of Unit 2 of the Condominium." Dkt. 126-11 at 3.

On January 8, 2020, Capital One sent another letter stating that the issues identified in its previous notices of default, including "business disruptions, property damage, threats to employee health and safety, and the defective status of HVAC system," "have been ongoing and remain uncured." Dkt. 126-12 ("Jan. 2020 Not.") at 2. Capital One also noted new issues that had emerged since its last letter. It cited several leaks reported in December 2019 and an instance of falling construction debris on December 14, 2019. *Id.* Capital One had also conducted – and informed Morris Terzi of – an air-quality test that found mold in the ATM area.

*Id.* JTRE now acknowledges that the defaults identified in this letter had persisted through January 2020 and remained uncured as of that date.  M. Terzi Dep. at 102:1-18.

Capital One's final notice, sent on February 25, 2020, stated that "this letter constitutes notice that the Bank is terminating the Lease, effective June 30, 2020" based on "JTRE's failure to cure its many defaults after the expiration of any reasonable cure period."  Dkt. 126-13 ("Feb. 2020 Not.") at 2 (footnote omitted).  The letter summarized issues with the Bank Building that had occurred since Capital One's July 2019 letter: additional leaks in the ATM vestibule in July 2019; falling debris on July 25, 2019; a partial power outage on July 26, 2019; a broken fire-alarm system discovered in October 2019; additional leaks from the roof reported on October 31, 2019; dust from Slate's construction activities on November 1, 2019; even more leaks in December 2019 after portions of the roof over the ATM area were removed; and a dysfunctional HVAC system "[f]or the third winter in a row."  *Id.* at 2-3.  Capital One said it was "exercising its right to terminate the Lease," the term of which "will expire on June 30, 2020."  *Id.* at 5.  Capital One further stated that "[i]f JTRE disputes the Bank's right to terminate the Lease, this letter will serve as notice of the Bank's right to early termination pursuant to Section 3.2 of the Lease.  Accordingly, even if JTRE disputes the Bank's right to terminate the Lease, the Lease term expires no later than the end of the sixth lease year pursuant to Section 3.2."  *Id.*  Again, JTRE has conceded that issues with the HVAC system and the roof remained uncured through February 25, 2020.  *See* M. Terzi Dep. at 104:7-11.

JTRE received each of these notices, even those that Capital One sent only to JTRE's counsel.  Pl. RSOF ¶¶ 56, 59, 61, 63, 65, 67.

### G.  Capital One Vacates the Property

On June 24, 2020, Capital One sent JTRE (who was unrepresented at the time) a request "to schedule a walkthrough of the Leased Space or to otherwise arrange for the Bank to turnover

the keys to the Leased Space to JTRE." *Id.* ¶ 140 (quoting Dkt. 126-16).  JTRE never responded to this request. *Id.* ¶ 141.

Capital One ceased operations at the Bank Building and left the Bank Building as of June 30, 2020. *Id.* ¶ 142.  Capital One paid JTRE all rent owed under the Lease through this date. *Cf.* Dkt. 119-34 (JTRE notice of tenant default requesting rent for the three months *after* June 2020). In vacating the building, Capital One removed everything except teller desks, audio-video equipment racks, and the two vaults.  Pl. RSOF ¶ 143.  The parties dispute who owned, and therefore had responsibility for removing, this property. *See id.*

On September 21, 2020, JTRE sent Capital One a "Notice of Tenant Default," requesting rent for the months of July, August, and September 2020.  Dkt. 119-34.  Capital One did not respond to this letter.  Df. RSOF ¶ 60.  On December 22, 2020, JTRE sent Capital One a "notice to cure," instructing Capital One to pay $404,212.70 in arrears of rent by January 8, 2021. Dkt. 119-35 at 1 (capitalization omitted).  JTRE advised that if Capital One failed to pay this amount before that date, it would "elect to terminate the Lease on three (3) days' notice." *Id.*  On January 11, 2021, JTRE issued a "Notice of Termination," stating that it had terminated the Lease effective as of January 15, 2021.  Dkt. 119-36 (further capitalization omitted).  Capital One did not respond to the Notice of Termination or pay JTRE any rent after June 30, 2020.  Df. RSOF ¶¶ 58, 63.

## II.   Procedural History

JTRE brought this action in New York state court on June 3, 2021, and Capital One removed the case to this District on July 1, 2021. *See* Dkt. 1.  In its operative complaint, JTRE alleged claims for breach of contract and negligent misrepresentation. *See* SAC.

On February 9, 2022, Judge Caproni dismissed JTRE's negligent-misrepresentation claim. *See JTRE Manhattan Ave. LLC v. Cap. One, N.A.*, 585 F. Supp. 3d 474, 481 (S.D.N.Y.

2022) (Dkt. 43).  However, JTRE's breach-of-contract claim survived.  *Id.* at 483.

On April 8, 2022, Capital One answered the Second Amended Complaint and asserted a breach-of-contract counterclaim against JTRE.  Ans.  On July 22, 2022, Judge Caproni denied JTRE's motion for leave to file a Third Amended Complaint and to "correct" its responses to Capital One's requests for admission.  *See JTRE Manhattan Ave. LLC v. Cap. One, N.A.*, No. 21-cv-05714 (VEC), 2022 WL 2901402 (S.D.N.Y. July 22, 2022) (Dkt. 91).  Shortly before the close of discovery, the case was reassigned to the undersigned on September 27, 2022.  *See* Dkt. 101.

On February 28, 2023, JTRE moved for summary judgment.  Pl. Br.  Capital One cross-moved for summary judgment and opposed JTRE's motion on March 14, 2023, Df. Br.; Capital One previously moved to exclude proposed testimony from JTRE's expert witness, James Robinson on February 13, 2023, Daubert Br.; *see* Dkt. 116 (Plaintiffs' opposition to Capital One's *Daubert* motion); Dkt. 117 (Capital One's reply in support of its *Daubert* motion).  JTRE and Capital One filed their replies on March 24, 2023, and April 3, 2023, respectively.  Pl. Reply; Df. Reply.

## III.    Applicable Legal Standard

Under Federal Rule of Civil Procedure ("Rule") 56, a moving party is entitled to summary judgment if, on any claim or defense, that party demonstrates from the admissible evidence and pleadings "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "genuine" dispute over an issue of material fact is one in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23).

In ruling on a motion for summary judgment, the court must view all evidence "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Mil. & Naval Affs.*, 373 F.3d 83, 89 (2d Cir. 2004), and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Est. of Gustafson ex rel. Reginella v. Target Corp.*, 819 F.3d 673, 675 (2d Cir. 2016) (quoting *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).  To defeat a motion for summary judgment, the non-moving party must advance more than "a scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rule 56 "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."  *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002).  It is instead the parties' responsibility to "point out" contested facts for the Court, and "to clarify the elements of the substantive law which remain at issue because they turn on contested facts." *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) (citation omitted).

If, as here, "both sides move for summary judgment, neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it."  *Heublin, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).  "When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a

matter of law for one side or the other."  *Id.*; *accord Morales v. Quintel Ent. Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).  "Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  *Morales*, 249 F.3d at 121.

## DISCUSSION

The Court will first address the cross-motions for summary judgment, and then Capital One's motion to exclude expert testimony, also known as a *Daubert* motion.  *See generally Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

### I.   Summary-Judgment Motions

New York law governs the Lease, which contains a New York choice-of-law clause. Lease § 33.8.  The parties also cite New York law in their briefs.  *See, e.g.*, Pl. Br. at 7; Df. Br. at 13-14.  Under New York choice-of-law rules, such "implied consent" is "sufficient to establish choice of law."  *Alphonse Hotel Corp. v. Tran*, 828 F.3d 146, 152 (2d Cir. 2016) (citation omitted).

To state a claim for breach of contract under New York law, a party must show: (1) the existence of a contract; (2) the plaintiff's adequate performance of the contract; (3) the defendant's breach of contract; and (4) damages.  *34-06 73, LLC v. Seneca Ins. Co.*, 198 N.E.3d 1282, 1287 (N.Y. 2022); *Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 409 (2d Cir. 2023).  A court may grant summary judgment on a contract claim "only when the contractual language is found to be wholly unambiguous and to convey a definite meaning."  *Martinez*, 88 F.4th at 409 (ellipsis omitted) (quoting *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008)).  "Whether contract terms are unambiguous presents 'a question of law that is resolved by reference to the contract alone.'"  *Id.* (quoting *O'Neil v. Ret. Plan for Salaried Emps. of RKO Gen., Inc.*, 37 F.3d 55, 59 (2d Cir. 1994)); *see Brad H. v. City of New York*, 951 N.E.2d

743, 746 (N.Y. 2011) (a court must assess ambiguity "within the four corners of the document"). Courts are to give the "words and phrases in a contract . . . their plain meaning" and construe the contract "so as to give full meaning and effect to all of its provisions." *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 114 (2d Cir. 2014) (alterations adopted and citation omitted). "Only where a contract's terms are ambiguous can extrinsic evidence be used to aid interpretation." *Tang Cap. Partners, LP v. BRC Inc.*, 661 F. Supp. 3d 48, 61 (S.D.N.Y. 2023).

JTRE claims that Capital One breached the Lease when it stopped paying rent after June 2020; it seeks not only rent owed from before JTRE's purported termination of the Lease in January 2021, but also liquated damages that include future rent through October 2035. *See* SAC ¶¶ 82-85; Pl. Br. at 2, 8. JTRE also claims that Capital One breached the Lease by failing to remove the vaults when it exited the Bank Building. Pl. Br. at 8. Capital One responds that it terminated the Lease in June 2020, after JTRE failed to cure numerous defaults, and therefore does not owe JTRE any further rent. Df. Br. at 1-2. Capital One argues, alternatively, that it need not pay rent through October 2035 because it exercised its early-termination right under the Lease, shifting the end of the Lease from October 31, 2035, to October 31, 2021. *Id.* Capital One also argues that it is not responsible for removing the vaults. *Id.* at 2-3. Finally, in its counterclaim, Capital One seeks reimbursement for costs that it incurred to address issues that, arguably, were JTRE's responsibility. *See* Ans. at 31-32.

In untangling these claims and motions, the Court first addresses whether JTRE breached the Lease such that Capital One's termination was justified. The assessment entails assessing whether the problems with the Bank Building were JTRE's responsibility, and, if so, whether Capital One's notices of default were effective. The Court next addresses JTRE's claim that

Capital One breached the Lease by failing to remove the two vaults from the Bank Building. Finally, the Court evaluates Capital One's motion for partial summary judgment on its counterclaim that JTRE breached the Lease by failing to reimburse Capital One for certain repair costs that were JTRE's responsibility.

### A. JTRE's Alleged Breaches

Capital One argues that JTRE failed to perform its obligations under the Lease because it did not provide adequate heat, did not repair the roof leaks, and allowed disruptive construction during business hours.  *See* Df. Br. at 4-12.  The Court addresses each theory of breach in turn.

#### 1.  Lack of Proper Heating

The Court first considers JTRE's alleged failure to fix the heating issues with the Bank Building.  As discussed, the parties agree that the building suffered from inadequate heating but dispute who was responsible under the Lease for addressing it.

The Court concludes that Capital One, as the tenant, was responsible for maintaining the Bank Building's HVAC system.  Section 10.1 of the Lease provides that, "[d]uring the Lease Term, Tenant shall maintain the heating, ventilating, and air-conditioning system (including, without limitation, the maintenance and replacement of the boiler unit) which exclusively services the Premises . . . , whether located within or outside of the Premises, pursuant to a maintenance contract."  *Id.* § 10.1.  The language of this clause is straightforward and plainly charges Capital One, as the tenant, with maintaining the Bank Building's HVAC system.  Insofar as the building's heating issues are attributable to defects with the HVAC system and not, say, to holes in the roof, the burden is Capital One's to bear.

In opposition, Capital One does not acknowledge Section 10.1 at all.  *See generally* Df. Br.  Instead, Capital One argues that JTRE agreed in Sections 8.3, 10.4, and 12.2(a) to operate and maintain the Bank Building in accordance with the "Comparable Building Standard," which

incorporated the New York City Building Code's minimum-temperature requirement for interior spaces. *Id.* at 4-5 (citing New York City Building Code § 1204.1 (2014), https://www.nyc.gov/assets/buildings/apps/pdf_viewer/viewer.html?file=2014CC_BC_Chapter_12_Interior_Environment.pdf&section=conscode_2014 [https://perma.cc/6CC2-SG89]); Df. Reply at 4 n.1 ("Capital One is not trying to enforce the NYC Building Code against [JTRE] but, rather, the requirements of the NYC Building Code that are impliedly written into the 'Comparable Building Standard' found in the Lease.").

For several reasons, the Court does not agree.  First, Capital One's incorporation argument lacks textual support.  The Lease defines the "Comparable Building Standard" as the "manner consistent with the practices of a majority of owners of comparable commercial buildings in the general geographic area of the Premises, as the term is understood in the general geographic area of the Property."  Lease § 10.4.  Absent from this definition is any mention of the NYC Building Code or a guarantee of heat.  Even if the NYC Building Code obligated JTRE to maintain the Bank Building at a minimum temperature of 68 degrees, nothing about the Lease suggests that it incorporated this requirement such that failing to maintain the Bank Building at that temperature would amount to a breach of contract.  Capital One's reading is also at odds with Section 8.2, which provides that "Landlord shall comply with all Governmental Regulations concerning all structural changes and/or additions to the Premises or the Building, including, but not limited to, compliance due to the general retail nature of the Premises."  *Id.* § 8.2.  Section 8.2 confirms that the parties knew how to incorporate certain municipal regulations into the Lease.  *See Huber v. ARCK Credit Co.*, No. 12-cv-08175 (JMF), 2015 WL 14077892, at *3 (S.D.N.Y. Jan. 28, 2015) ("The references to the relevant origination agreement make plain that the parties to the loan agreements knew how to draft the agreements to explicitly cover existing

loans; the absence of any explicit reference to the SageCrest Loan, therefore, weighs strongly against the ARCK Parties' preferred reading."); *Netherby Ltd v. Jones Apparel Grp., Inc.*, No. 04-cv-07028 (GEL), 2007 WL 1041648, at *19 (S.D.N.Y. Apr. 5, 2007) (other clause "impos[ing] a more concrete obligation on defendants . . . demonstrates that the parties knew how to draft a clause requiring the provision of specific information when that was their intention"). Had the parties intended to also incorporate the minimum-temperature requirements of the NYC Building Code, Section 8.2 would have likely reflected such a stipulation. Instead, the section requires the Landlord's compliance with municipal regulations only as to "structural changes" and "additions" to the Bank Building. Lease § 8.2.

Second, Capital One marshals insufficient evidence in support of incorporation. Capital One asserts that the "majority of the building owners for Capital One's retail bank branches in New York City followed the New York City Building Code with respect to minimum interior temperatures." Pl. RSOF ¶ 40. Even if that were true, the scope of the "Comparable Building Standard" is not limited to the practices of most owners of Capital One's bank branches in New York City; rather, it applies broadly to the practices of most "owners of comparable commercial buildings in the general geographic area of the" Building. Lease § 10.4. The "Comparable Building Standard," therefore, could plausibly account for the practices of the owners of commercial buildings that are home to other banks and different types of retail companies, including those located in New Jersey or Long Island. On this point, Capital One makes no showing.

Third, Section 10.1 trumps the Lease's references to the Comparable Building Standard in controlling Capital One's obligations to maintain and repair the Bank Building's HVAC system. Under New York law, "[w]here there is an inconsistency between a specific provision

and a general provision of a contract, the specific provision controls." *Aguirre v. City of New York*, 625 N.Y.S.2d 597, 598 (2d Dep't 1995); *see Aramony v. United Way of Am.*, 254 F.3d 403, 413 (2d Cir. 2001) ("[I]t is a fundamental rule of contract construction that 'specific terms and exact terms are given greater weight than general language.'" (quoting Restatement (Second) of Contracts § 203(c) (Am. L. Inst. 1981))).  "Even where there is no true conflict between two provisions, specific words will limit the meaning of general words if it appears from the whole agreement that the parties' purpose was directed solely toward the matter to which the specific words or clause relate."  *Aramony*, 254 F.3d at 413-14 (quotation marks and citation omitted). Therefore, even if the "Comparable Building Standard," considered in isolation, somehow incorporated a generalized requirement to keep the Bank Building's interior above a minimum temperature, that requirement is limited by the specific operative language of Section 10.1, which establishes Capital One's responsibility for maintaining and repairing the Bank Building's heating, ventilation, and air-conditioning system.

Further confirming the Court's conclusion is the fact that Capital One's reading of the "Comparable Building Standard" would deprive Section 10.1 of any meaning.  By contrast, reading Section 10.1 to charge Capital One with responsibility for the Bank Building's HVAC system preserves the significance of the "Comparable Building Standard" in Sections 8.3, 10.4, and 12.2(a) as to many other aspects of the Bank Building's upkeep.  *See Spinelli v. Nat'l Football League*, 903 F.3d 185, 200 (2d Cir. 2018) (a court must give "effect and meaning to every term of a contract and strive to harmonize all of its terms" (brackets, ellipsis, quotation marks, and citation omitted)); *Macy's Inc. v. Martha Stewart Living Omnimedia, Inc.*, 6 N.Y.S.3d 7, 11-12 (1st Dep't 2015) ("[T]he rules of construction of contracts require the court to adopt an interpretation which gives meaning to every provision of a contract or, in the negative,

no provision of a contract should be left without force and effect." (further brackets and citation omitted)); *N.Y. State Thruway Auth. v. KTA-Tator Eng'g Servs., P.C.*, 913 N.Y.S.2d 438, 440 (4th Dep't 2010) ("It is well settled that a contract must be read as a whole to give effect and meaning to every term.  Indeed, a contract should be interpreted in a way that reconciles all of its provisions, if possible." (brackets, quotation marks, and citations omitted)).  Therefore, the Court cannot conclude as a matter of law that the Bank Building's inadequate heating constituted a breach by JTRE under the Lease.

      *2.  Leaks*

      The Court next considers JTRE's alleged failure to fix leaks in the roof of the Bank Building.  As with the Bank Building's lack of proper heat, the parties agree that the Bank Building suffered from leaks in the roof but dispute responsibility under the Lease.

      The Court holds that JTRE, as the Landlord, was responsible for fixing the Bank Building's roof leaks.  Under Section 10.2, "Landlord shall, at its expense without reimbursement or contribution by Tenant . . . keep, maintain, and replace, if necessary, . . . structural systems, including without limitation, the roof, roof membrane, [and] roof covering." Lease § 10.2.  JTRE concedes that, under the Lease, it was responsible for "ordinary roof maintenance."  Pl. Reply at 5.  Yet it points to several provisions – Sections 10.4, 12.2, 12.3, and 34.1 – that it claims supersede Section 10.2.  *Id.*  None of these provisions upsets the Court's conclusion.

      JTRE argues that, under Section 10.4, it is not "liable for any failure on the part of the Owner and/or Condominium Board."  *Id.* (quoting Lease § 10.4).  Yet JTRE plucks this quote out of context.  The relevant sentence reads, in full:

> Following the transfer of ownership of the Calyer Building,
> Landlord shall use commercially reasonable efforts to cause the
> owner and/or Condominium Board, as applicable, to maintain the

> Calyer Building in accordance with the Comparable Building
> Standard; provided, however, Landlord shall not be liable for any
> failure on the part of the owner and/or Condominium Board.

Lease § 10.4.  The full sentence makes clear that the quoted language refers only to JTRE's

liability should Slate or the Condominium Board fail to maintain the *Calyer Building* in

accordance with the Comparable Building Standard.  It bears little on JTRE's liability under

Section 10.2 for failing to maintain the Bank Building's roof.  For the same reasons, JTRE's

reliance on identical language in Section 12.2(a) is unavailing.  *See id.* § 12.2(a).

JTRE also looks to Section 12.3, which states that "Landlord shall not be liable to Tenant

in damages or otherwise if the utilities or services are interrupted or terminated because of

repairs, installations, improvements, or any cause beyond Landlord's reasonable control, nor

shall any such interruption or termination relieve Tenant of the performance of any of its

obligations hereunder."  *Id.* § 12.3.  Yet this section addresses only the remedies available to

Capital One after the interruption of utilities or services, not JTRE's responsibility to keep the

*roof* of the Bank Building in good condition.

Finally, JTRE relies on Section 34.1, in which "Tenant acknowledges that Landlord

intends [to] convert the Property to a condominium form of ownership" and that, "to complete

the Condominium Conversion, the Building may undergo construction, alterations, additions or

improvements which may consist of demolition or cause excessive noise, vibrations, dust, debris,

and the erection of scaffolding or other protective measures."  *Id.* § 34.1.  Nothing in this

acknowledgement contemplates a roof leaking so badly that it sometimes forced Capital One to

close its branch.  Nor does it discharge JTRE's attendant duty under Section 10.2 to fix those

leaks when they occurred.  Therefore, the Court holds that JTRE's continued failure to repair the

Bank Building's roof leaks breached Section 10.2 of the Lease.

>   *3.   Construction-Related Disruptions*

Finally, the Court turns to Capital One's allegations that JTRE breached the Lease by allowing disruptive construction at the Property.  Again, the parties agree that construction by Slate forced Capital One to close its branch at the Bank Building on at least four occasions between November 2018 and February 2020.  *See* Pl. RSOF ¶ 99.  However, they dispute whether JTRE's conduct around those closures amounted to a breach of the Lease.

Genuine disputes of material fact preclude the Court from determining, one way or the other, whether JTRE failed to perform its obligations under the Lease regarding the allegedly disruptive construction by Slate.  Under Section 29, JTRE "covenants that . . . Tenant shall peaceably and quietly have, hold and enjoy the Premises subject to the provisions and agreements hereof without interference by any persons lawfully claiming by or through Landlord."  Lease § 29.  The import of this covenant, however, is limited by Capital One's acknowledgement elsewhere that "the Building may undergo construction . . . which may consist of demolition or cause excessive noise, vibrations, dust, [and] debris."  *Id.* § 34.1.

The more salient provision is Section 34.1, under which JTRE "agree[d] that any work that would materially adversely affect the conduct of Tenant's business in the Premises such that Tenant can no longer reasonably operate its business within the Premises pursuant to this Lease shall be performed after normal business hours."  *Id.*  Contrary to JTRE's suggestion, there is little question that Capital One's business was materially adversely affected by its four closures such that it could no longer reasonably operate in the Bank Building.  *See* Pl. Reply at 6.  If a closure does not trigger this language, nothing does.  However, it remains unclear whether the four closures at issue resulted from construction work that occurred during business hours.  For example, the parties agree that Capital One closed its branch on July 18, 2019, after rain entered the Bank Building through a hole in the roof that opened when Slate "demoed" the roof a few

days earlier.  Pl. RSOF ¶ 107; July 2019 Not. at 5.  The parties do not clarify in their Rule 56.1

statements, however, when that construction work took place.  If it took place outside of business

hours, there would be no formal violation of Section 34.1.  In any event, the somewhat limited

number of closures – three full closures and one partial closure over a 16-month period – cast

doubt on the suggestion that JTRE failed to cure any defaults under this part of the Lease.

Therefore, the Court denies summary judgment to both JTRE and Capital One with respect to

JTRE's alleged breaches for allowing disruptive construction.[2]

### B. Capital One's Notices

Because JTRE at least failed to perform its obligation to fix the Bank Building's roof

leaks, the Court considers whether JTRE received effective notice of its default from Capital

One.  *See* Lease § 21.1 ("Landlord shall not be in default unless Landlord fails to perform or

observe any of its obligations under this Lease [within 30 to 90] days after Landlord's receipt of

written notice from Tenant.").

JTRE challenges the validity of Capital One's notices of default, arguing that they were

technically deficient under Sections 21 and 31 of the Lease because they: (1) were sent to

JTRE's law firm instead of JTRE; (2) failed to specify a cure-by date; (3) "did not advise JTRE

that such notice was, in fact, a default notice under [Section] 21 of the Lease"; and (4) did not

reserve Capital One's right to terminate the Lease.  Pl. Br. at 10-11.  The Court finds each of

these arguments unconvincing.

---

[2] Similarly, the factfinder will need to determine at trial whether other instances of disruptive construction that did not result in a closure kept Capital One from reasonably operating its business.

1.  *Incorrect Address*

First, JTRE argues, Capital One's notices were deficient because "they were not properly served upon JTRE at the JTRE Notice Address."  Pl. Br. at 10.  JTRE notes that Capital One's letter of termination, dated February 25, 2020, was sent to JTRE's then-counsel rather than JTRE itself.  *See id.* at 12.  Capital One counters that, notwithstanding a contractual notice provision that specifies an address, actual notice elsewhere is effective so long as the notified party does not claim prejudice from receiving notice at the non-contractual location.  *See* Df. Br. at 15-17.

Capital One correctly states New York law: "strict compliance with contractual notice provisions need not be enforced where the adversary party does not claim the absence of actual notice or prejudice by the deviation."  *Baygold Assocs., Inc. v. Congregation Yetev Lev of Monsey, Inc.*, 916 N.Y.S.2d 639, 640 (2d Dep't 2011) (quoting *Fortune Limousine Serv., Inc. v. Nextel Comm'cns*, 826 N.Y.S.2d 392, 395 (2d Dep't 2006)); *accord Schweizer v. Sikorsky Aircraft Corp.*, 634 F. App'x 827, 829 (2d Cir. 2015) (summary order); *Thor 680 Madison Ave. LLC v. Qatar Luxury Grp. S.P.C.*, No. 17-cv-08528 (PGG), 2020 WL 2748496, at *12 (S.D.N.Y. May 27, 2020) (collecting cases).  "New York recognizes the doctrine of substantial compliance, even in the context of a commercial lease between sophisticated parties, where a party relied in good faith on its interpretation of its obligations under the lease and in the absence of prejudice to the other party."  *Extreme Reach, Inc. v. PGREF I 1633 Broadway Land, L.P.*, No. 22-cv-07948 (VEC), 2023 WL 3173767, at *3 (S.D.N.Y. May 1, 2023).

Here, JTRE does not dispute that it actually and timely received Capital One's February 2020 termination notice, as well as Capital One's other notices of default.  *See* Pl. RSOF ¶¶ 56, 59, 61, 63, 65, 67; *see* M. Terzi Dep. at 95:14-16, 100:25-101:2, 115:7-13; J. Terzi Dep. at 61:1-3, 64:19-65:9.  JTRE also does not claim any prejudice from the fact that Capital One sent this correspondence to JTRE's lawyers.  *See* M. Terzi Dep. at 116:12-117:8.  These circumstances

distinguish the instant case from those cited by JTRE, where actual notice was either absent or disputed. *See* Pl. Br. at 12; *Brueckner v. You Can Beam LLC*, No. 20-cv-03323 (JSR), 2021 WL 2158733, at *5 (S.D.N.Y. May 27, 2021); *LG Cap. Funding, LLC v. MineralRite Corp.*, No. 16-cv-06158 (PKC) (VMS), 2017 WL 9250297, at *11 (E.D.N.Y. Dec. 1, 2017); *Core Servs. Grp., Inc. v. Teams Hous. Dev. Corp. Fund, Inc.*, No. 654438/2013, 2016 WL 4490626, at *3 (N.Y. Sup. Ct. Aug. 25, 2016). Therefore, JTRE's challenge to the site of notice fails. *See Thor 725 8th Ave. LLC v. Goonetilleke*, 138 F. Supp. 3d 497, 509-11 (S.D.N.Y. 2015) (plaintiff's termination of commercial lease sent to the wrong address was valid where notice was "actually and timely received" and claims of prejudice were unsupported), *aff'd*, 675 F. App'x 31 (2d Cir. 2017) (summary order).

### 2. Cure Period

Second, JTRE claims that Capital One's notices were invalid because they "failed to specify a date in which JTRE was required to cure the defaults alleged therein." Pl. Br. at 11. Section 21.1 of the Lease, however, established a cure period, requiring JTRE to cure any defaults no "later than thirty (30) days after Landlord's receipt of written notice from Tenant" or, at most, within 90 days of receipt "if the cure of such Landlord Default reasonably require[d] more than thirty (30) days to complete" and JTRE "promptly commence[d] the cure" and "diligently pursue[d] such cure to completion." Lease § 21.1. Nothing in this Section required Capital One to provide a date certain of JTRE's time to cure in its notices of default. Because JTRE was on notice of its time to cure, Capital One's failure to include those dates in its notices does not render them ineffective.

### 3. Notice of "Default"

Third, JTRE claims invalidity because Capital One's notices "did not advise JTRE that such notice was, in fact, a default notice under [Section] 21 of the Lease." Pl. Br. at 11. As with

the cure period, Section 21.1 contains no requirement for Capital One to refer to its notices as notices of "default."  In any event, many of Capital One's notices, including its termination letter, either included the word "default" or stated that JTRE had breached its contractual obligations under the Lease.  *See* Oct. 2018 Not. at 2 ("Please be advised that this letter shall serve as formal notice of Landlord's failure to meet its contractual obligations set forth in the Lease."); Dec. 2018 Not. at 2 ("[T]his shall constitute the Bank's Fourth Notice of Default."); July 2019 Not. at 5 ("As suggested by the title to this letter as the *fifth* notice of default, the Bank's multiple attempts to prompt JTRE to address the Property Issues and pay the Cost Statement have not been successful as these issues persist."); Jan. 2020 Not. at 2 ("These defaults have been ongoing and remain uncured."); Feb. 2020 Not. at 2 ("Pursuant to Section 21.1 of the Lease, JTRE's failure to cure its many defaults after the expiration of any reasonable cure period grants the Bank the right to terminate the Lease.").

## 4. *Reservation of Right to Terminate*

Finally, JTRE argues that Capital One's notices "[d]id not advise[] JTRE that . . . Capital One reserved its right to terminate the Lease."  Pl. Br. at 11.  Again, Section 21.1 contains no such requirement.  Instead, Section 21.2 of the Lease itself reserved Capital One's right to terminate the Lease.  *See* Lease § 21.2 ("Tenant's exercise of any right or remedy . . . shall not be deemed a waiver of or to alter, affect, or prejudice any right or remedy which Tenant may have under this Lease or by law or in equity.").  In any event, many of Capital One's notices, including its termination letter, included the reservation of rights that JTRE claims is absent.  *See* Dec. 2018 Not. at 4 ("Nothing contained in this letter is a waiver of any other defaults that may exist, or a waiver of any of the Bank's rights and remedies, all of which are hereby reserved."); *accord* July 2019 Not. at 6; Jan. 2020 Not. at 4; Feb. 2020 Not. at 5.

Because Capital One's notices were valid and effective, they converted JTRE's failure to repair the Bank Building's roof leaks into a default under the Lease that granted Capital One the right, upon written notice, to terminate the Lease. Capital One provided such notice with its February 25, 2020 letter. Therefore, the Court holds that the Lease terminated, at Capital One's election, on June 30, 2020, and Capital One therefore did not breach the Lease by failing to pay rent after that date.

### C. The Vaults

In addition to arguing that Capital One defaulted on its rent, JTRE argues that the Lease obligated Capital One to remove the two bank vaults when it left the Bank Building. *See* Pl. Br. at 8.

The Court does not agree. The Lease provides in Section 14 that, "upon the expiration or earlier termination of this Lease, Tenant shall remove its trade fixtures, security deposit box assemblies, ATMs, signs, and all other personal and/or proprietary property" from the Bank Building. Lease § 14. While "trade fixtures" are not defined in the lease, New York common law defines them as "articles of personal property which a tenant places upon or annexes to the leased realty for the purpose of carrying on its trade or business during the term of its lease." *JIS Pan, LLC v. Pelle & Pelle*, 196 N.Y.S.3d 551, 552 (2d Dep't 2023) (quoting *J.K.S.P. Rest., Inc. v. County of Nassau*, 513 N.Y.S.2d 716, 720 (2d Dep't 1987)); *see E. Side Car Wash, Inc. v. K.R.K. Capitol, Inc.*, 476 N.Y.S.2d 837, 840 (1st Dep't 1984) ("Trade fixtures are fixtures installed by a tenant during its lease term to carry on its business. They are the fixtures which the lessee has supplied at its own expense and has the right under the lease to remove."). JTRE does not credibly dispute that Capital One never installed any vaults during its tenancy and that the vaults were already in the Bank Building when the bank became a tenant in 2009. *See* Pl. RSOF ¶ 5; Dkts. 127 ¶¶ 10-12 (testimony of Capital One's regional Extended Operations

Manager), 127-1 (certificate of occupancy showing vaults in the basement of the Bank Building in 1938).  Because Capital One did not install the vaults itself, they are not trade fixtures.  *See E. Side Car Wash*, 476 N.Y.S.2d at 840 (although underground gasoline tanks have been treated as trade fixtures, they were not trade fixtures where they were not installed by a tenant during its lease term to carry on its business).

Even if the vaults were "trade fixtures" that belong to Capital One, their title passed to JTRE when Capital One terminated the Lease and vacated the Bank Building.  *See* Lease § 14 ("At the expiration of the Lease Term, the Improvements (and any of Tenant's Trade Fixtures as Tenant fails to remove), without the payment of compensation or consideration of any kind to Tenant, shall become Landlord's sole property, free and clear of any and all claims of Tenant.").  JTRE cannot demand compensation for removing vaults that it now owns.  Therefore, the Court grants summary judgment to Capital One on JTRE's breach-of-contract claim as to the bank vaults.

### D.  Conclusion on JTRE's Claim

Because JTRE failed to perform under the Lease by failing to repair the Bank Building's roof leaks, its breach-of contract claim must fail.  *See, e.g.*, *Abraham v. Leigh*, 471 F. Supp. 3d 540, 561 (S.D.N.Y. 2020) (a "breach of contract claim must fail" where the "[p]laintiff did not fully perform under the [contract]").  Capital One also owes JTRE no compensation for its removal of the bank vaults.  Therefore, the Court grants summary judgment in full to Capital One on JTRE's breach-of-contract claim.[3]

---

[3] Given this conclusion, the Court need not reach Capital One's (sound) argument that JTRE is not entitled to rent payments from Capital One beyond the Lease's Early Termination Date of October 31, 2021.

### E. Capital One's Counterclaim

Capital One seeks partial summary judgment as to JTRE's liability on Capital One's counterclaim. Df. Br. at 3. Each element of this claim for breach of contract is met. The parties agree that an agreement – the Lease – existed between them. *See* Pl. RSOF ¶ 8; Df. RSOF ¶ 22. For the reasons stated above, Capital One adequately performed its obligations under the Lease while JTRE did not perform at least its obligation to repair the Bank Building's roof leaks (if not also by allowing disruptive construction during business hours). As to the last element of a breach-of-contract claim, the Court finds that Capital One has set forth sufficient evidence demonstrating that JTRE's breach has caused at least some damages, the amount of which will be determined at trial. *See, e.g.*, Dkt. 127-31 (Capital One paid Charel $9,526.56 in March 2019 for "interior repairs due to water leaks" (capitalization omitted)).[4]

JTRE argues that Capital One cannot obtain damages for alleged breaches by JTRE predating May 7, 2018, when Capital One issued the Estoppel Certificate acknowledging its understanding that 807 Holdings, as the then-landlord, was not in default under the Lease. Pl. Br. at 13-14. While JTRE may be correct that the Estoppel Certificate limits Capital One's ability to recover some of its claimed damages – an issue that the Court does not reach here – the Estoppel Certificate bears little on JTRE's ultimate liability for breaching the Lease. *See* Lease § 21.1 (defining a "Landlord Default" as the landlord's "fail[ure] to perform or observe any of its obligations under this Lease after a reasonable period time"). It does not absolve JTRE of any breaches that occurred after JTRE assumed 807 Holdings's obligations under the Lease.

---

[4] However, Capital One likely will not be able to collect the full $366,545.37 sought from JTRE in its counterclaim. *See* Ans. at 31-32. At the very least, Capital One appears to have incurred costs for temporary heat, for which it may have been responsible under Section 10.1 of the Lease. The Court declines here to undertake a full accounting of Capital One's enforceable damages, holding only that Capital One has presented enough evidence of damages attributable to JTRE's breach for Capital One's counterclaim to continue to trial.

Therefore, the Court grants partial summary judgment to Capital One as to JTRE's liability on Capital One's counterclaim.

## II.     Capital One's *Daubert* Motion

Capital One has also moved to exclude JTRE's expert witness, who opined about the cost of removing the vaults.  Daubert Br.  Because the Court has now held that Capital One was not responsible for removing the vaults from the Bank Building, Robinson's testimony (expert or otherwise) as to the cost of their removal is no longer relevant to any claims in this case and therefore not admissible under Federal Rule of Evidence 402.  *See Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." (citation omitted)).  Therefore, the Court will exclude Robinson's testimony as irrelevant.  *See Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 745-46 (S.D.N.Y. 2011) (declining to consider methodological flaws in a confusion survey where survey was excluded as irrelevant); *McBeth v. Porges*, No. 15-cv-02742 (JMF), 2018 WL 5997918, at *7 (S.D.N.Y. Nov. 15, 2018) (granting in part motion to exclude expert testimony that was not relevant to plaintiff's surviving claims).

## CONCLUSION

For the reasons stated above, JTRE's summary-judgment motion is DENIED.  Capital One's summary-judgment motion is GRANTED as to JTRE's claims against Capital One, and the Court dismisses JTRE's breach-of-contract claim.  Capital One's motion for partial summary judgment on liability on its counterclaim against JTRE for failure to fix the roof is also GRANTED.  Finally, Capital One's motion to exclude JTRE's expert testimony is GRANTED.

This case will now proceed to a bench trial on the remaining portions of Capital One's counterclaim against JTRE for breach of contract.  The fact issues to be tried will include (1) whether JTRE is also liable for allowing disruptive construction during business hours and

(2) the amount of damages owed by JTRE to Capital One for any breaches.  The Court directs

the parties to promptly confer, and, within 30 days of this decision, submit a joint pretrial order

and other pretrial submissions consistent with the Court's Individual Rules 5(A) and 5(C)

governing nonjury trials.  The parties need not submit affidavits of direct testimony pursuant to

the Court's Individual Rule 5(C)(iv).

The Clerk of Court is respectfully directed to terminate the motions at Dkts. 113, 118,

and 122.

Dated: June 27, 2024
       New York, New York

SO ORDERED.

JENNIFER L. ROCHON
United States District Judge

35